REVISED March 30, 2001

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-41023
_____

BETTY THOMPSON; DONALD THOMPSON,

                                        Plaintiffs-Appellees,

        versus

UPSHUR COUNTY, TX; ET AL,

                                        Defendants.

R.D. CROSS, Individually
and in his official capacity
as Sheriff of Upshur County, TX;
PAULA WHORTON, Individually and
in her official capacity as
Jailer, Upshur County;
ROBERT CROMLEY, Individually and
in his official capacity as
Lieutenant, Upshur County Jail,

                                        Defendants-Appellants.

                    ------------------

            Consolidated with No. 99-41024

                    ------------------

BETTY THOMPSON; DONALD THOMPSON,

                                        Plaintiffs-Appellees,

        versus

UPSHUR COUNTY, TX; ET AL,

                                        Defendants,

        EUGENE TEFTELLER, Individually
        and in his official capacity
        as Sheriff, Marion County, TX;

                                        Defendant-Appellant.

                    _____

            Appeal from the United States District Court
                for the Eastern District of Texas
                    _____
                        March 15, 2001

Before GARWOOD, HIGGINBOTHAM and STEWART, Circuit Judges.

GARWOOD, Circuit Judge:

    In this 42 U.S.C. § 1983 and state law suit for damages
arising from the death of Michael Thompson (Thompson), a pretrial
detainee in the respective jails of Upshur County, Texas, and
Marion County, Texas, defendants-appellants Eugene Tefteller
(Tefteller), formerly Sheriff of Marion County, R.D. Cross (Cross),
Sheriff of Upshur County, and Paula Whorton (Whorton), an Upshur
County jailer, appeal the district court's denial of their motions
for summary judgment based on qualified immunity.  We reverse as to
Tefteller and Cross, but affirm as to Whorton.

                    **Facts and Proceedings Below**

    At approximately 4:35 p.m. on Monday, August 25, 1997,
Thompson, unmarried and about thirty-three years old, was arrested
in Upshur County, Texas for D.W.I.  A breathalyzer test indicated
his blood alcohol level was 0.348%.  Because Upshur County's jails

                                2

were overcrowded, Thompson, on August 26, after having spent the night of August 25 in the Upshur County jail where charges were lodged against him, was transferred by Upshur County to the Marion County jail pursuant to a pre-existing general agreement between the two counties. He arrived at Marion County jail on Tuesday, August 26 at 9:55 p.m.[1]

Thompson does not appear to have been in special distress until the early morning hours of Thursday, August 28, when he began suffering from delirium tremens (DTs).[2] Thompson was shaking, sweating profusely, and hallucinating. Specifically, Thompson saw snakes coming out of the walls, requested a screwdriver so he could build a house, and believed he was at a barbecue in Gladewater, Texas. Upon becoming aware that Thompson might be in need of medical assistance, Marion County Chief Jailer Linda Bolick (Bolick) called for an ambulance at 10:47 a.m. The Emergency

---

[1]We take judicial notice that Marion county is located in rural East Texas and has a population of approximately 11,000; its county seat and largest town is Jefferson, with a population of approximately 2,000. Upshur County partially adjoins Marion County, has a population of about 35,000 and its county seat and largest town is Gilmer, which has some 5,000 inhabitants.

[2]"Delirium tremens, or the 'DTs,' affects roughly 5 percent of alcoholics in the withdrawal stage and about 30 percent of sufferers of rum fits. It generally makes its appearance within three to five days after drinking has ceased. The standard signs of delirium tremens include agitation, fever, sweating, tachycardia and tremor. Patients become so disoriented that they do not know what time it is or where they are. They suffer such confusion that memory lapses block out both recent events and those long past. Vivid visual hallucinations are also common." 9 *Attorneys' Textbook of Medicine* P 59A.22(2) (Gray & Gordy, eds., 3rd ed. 2000).

Medical Technicians (EMTs) confirmed Thompson was experiencing DTs, warned him that injuries and death could result therefrom, told him that he should go to the hospital and urged him to do so.  Thompson explained that he had experienced DTs before and that if he could consume three beers he would be fine.  Despite the efforts of Bolick and the EMTs to convince Thompson to go to the hospital, he refused at least twice. Bolick conferred with the EMTs and all believed that Thompson had the capacity to make the decision.  Bolick told the EMTs that to force Thompson to submit to health care against his will would violate his constitutional rights.  The EMTs believed that because Thompson was conscious, they could not force him to be transported to the hospital.  Thompson signed a refusal of medical treatment form, and nothing in the record suggests he was forced to do so.  Plaintiffs-appellees Betty and Donald Thompson (Michael's parents) contend that Thompson was not competent to refuse medical treatment.  There is some evidence that Marion County sheriff Tefteller had some generally contemporaneous awareness of these developments as they occurred.[3]

---

[3]In a disclosure to plaintiffs, Marion County and Tefteller stated that sheriff Tefteller would testify that he had helped Thompson drink some liquids, that Thompson appeared competent to make medical decisions, and that Thompson told him that he had previously experienced DTs but had never sought medical treatment therefor.  As a result of this evidence, plaintiffs allege not only supervisory liability, but also that Tefteller was personally deliberately indifferent to Thompson's medical needs by not taking charge of the situation and forcing Thompson to be transported to the hospital.  In the same vein, plaintiffs complain that Tefteller did not seek (or train his employees to seek) an alternative decision-maker for pre-trial detainees who incompetently refuse medical treatment.

Jailer Bolick then made arrangements to transfer Thompson back to Upshur County because its jail, unlike that of Marion County, had a detoxification cell that would facilitate the observation and care of Thompson. Less than two hours elapsed between the EMTs' visit and Thompson's departure for the Upshur County jail at about 12:30 p.m. During the forty-five minute trip to the Upshur County jail, Thompson appears to have had a lucid conversation with Upshur County Deputy Decuir, driver of the Upshur County vehicle which took Thompson back to Upshur County.

Upon his return to the Upshur County Jail, Thompson was placed in a special "detox" cell. Defendant jailer Sgt. Whorton began work that Thursday, August 28, at 3:00 p.m. She was aware that Thompson was suffering from DTs and had refused medical treatment in Marion County. She began an observation log on Thompson at 5:00 p.m. and claims to have called a hospital from which she received medical advice concerning Thompson's care. The advice was to keep Thompson in a dark, quiet area, to try to keep him calm, and to call back if he started convulsing or seizing. Plaintiffs dispute that any advice was obtained, and submitted an affidavit from Bonita Fincher, the Nurse Supervisor at East Texas Medical Center. Ms. Fincher declared that the hospital has a policy of not providing medical advice over the telephone and that Chevaughn Shaw, the nurse who spoke with Whorton, was aware of this policy.[4]

---

[4]In her affidavit, Ms. Fincher implies (but does not expressly state) that Ms. Shaw assured her that no medical advice was given to

5

Thompson's condition worsened into the evening. He began to collide with objects in his cell, sometimes falling and striking his head against the window, floor or concrete bench of his cell. Whorton was aware of this and noticed what she thought was blood flowing from Thompson's ears. After Thompson was placed in a straight jacket, Whorton entered the cell and cleaned his wounds. She noted that the blood had not come from his ears, but rather from a small cut on the back of his head. Additional mattresses were placed in the cell for Thompson's protection, but he was not fitted with a helmet, which, as Whorton knew, was kept available for such a purpose. After this, Thompson appeared to calm down.

Whorton's shift ended at 11:00 p.m. Jailers Bishop and Bean relieved her. Whorton discussed Thompson's condition with them. In her affidavit, Bishop stated that: 1) Whorton told her and Bean to leave Thompson alone unless he was going to bleed to death; 2) Whorton told her and Bean that "we don't take inmates to the hospital unless they're dying"; 3) after Bishop asked if an ambulance should be called for Thompson, Whorton responded that she had already contacted the emergency room and that there was nothing

Sgt. Whorton (Fincher says Shaw stated "she knew the policy and told Sgt. Whorton to either come to the emergency room or call the Health First number for advice"). Fincher's testimony is clearly hearsay insofar as it attempts to substantively evidence what Shaw actually said to Whorton. Nevertheless, the magistrate found that the absence of advice could be proven at trial, and as will be discussed *infra*, we do not have jurisdiction to now review that finding. Therefore, for purposes of their interlocutory appeal we assume that Sgt. Whorton did not obtain any medical advice from Ms. Shaw.

6

that could be done for Thompson, that he just had to "sleep it off"; 4) Whorton informed Bishop and Bean that Thompson would soon be transferred to Huntsville, and thus wouldn't be their problem for much longer; 5) Whorton commanded Bishop and Bean not to summon medical help for Thompson without calling her at home, i.e. that Whorton was to make that decision; 6) after Whorton departed, Bishop and Bean considered calling an ambulance for Thompson, but did not do so because they were afraid to "go over Sgt. Whorton's head"; and 7) Bishop and Bean considered calling Whorton at home to obtain permission to call an ambulance for Thompson, but they did not do so because Whorton had instructed them not to bother her at home unless Thompson was dying.

Thompson accepted water or orange juice two times during the early hours of Friday, August 29, 1997. At about 7:10 a.m., Thompson appeared to have a thirty-second seizure. A few minutes after the seizure ended, Thompson stopped breathing. Paramedics were summoned at 7:21 a.m. Thompson was pronounced dead at 9:10 a.m. at East Texas Medical Center. An autopsy revealed the cause of death to be the result of delirium tremens.

On July 16, 1998, plaintiffs-appellees Betty Thompson and Donald Thompson filed this action against Upshur County, Upshur County sheriff R.D. Cross, Upshur County jailer Sgt. Paula Whorton, Upshur County jailer Lt. Robert Cromley, Marion County, and Marion County sheriff Eugene Tefteller, asserting claims under 42 U.S.C. § 1983, the Texas Survival and Wrongful Death Statute, TEX. CIV.

7

PRAC. & REM. CODE ANN. § 71.021 and the Texas Tort Claims Act, TEX. CIV. PRAC. & REM. CODE ANN. § 101.001 *et seq.*, for the failure of defendants to provide reasonable medical care to their son, Michael Thompson, which resulted in Michael's death.[5]

All defendants eventually moved for summary judgment based solely on the issue of qualified immunity.[6] The parties consented to trial by magistrate McKee and on January 21, 1999, the case was transferred to him. In separate orders, dated August 16 and 20, 1999, Magistrate McKee denied the motion to strike certain affidavits tendered by plaintiffs and all motions for summary judgment (except Cromley's, which was not considered).

In his order concerning Tefteller, the magistrate found that there were several "fact issues" that precluded granting summary judgment based on qualified immunity: 1) whether Thompson was capable of determining if he required medical attention; 2) whether

---

[5] Section 1983 liability for Cross is based entirely on supervisory liability. Section 1983 liability for Whorton is premised only upon her direct interaction with Thompson and other jailers. As mentioned (see note 3, supra), section 1983 liability for Tefteller is premised upon both supervisory liability and his own individual involvement with Thompson.

[6] Tefteller moved for summary judgment on January 20, 1999. Cross and Whorton so moved on February 4, 1999. Cromley also moved for summary judgment, but not until May 20, 1999. Lt. Cromley's motion for summary judgment was not resolved with the others. Thus, notwithstanding that his name appeared with Cross's and Whorton's on the notice of interlocutory appeal to this court, it appears that Lt. Cromley has not appealed to this Court.

Marion and Upshur Counties joined in the motions for summary judgment on the ground of sovereign immunity. The counties have not appealed to this Court.

a reasonably diligent attempt to locate a surrogate decision-maker was made; 3) whether Tefteller could have required Thompson to receive medical attention against his will; 4) whether Tefteller had a duty to require Thompson to receive medical attention; 5) if Tefteller could have forced Thompson to receive medical attention, whether the decision not to do so amounts to deliberate indifference to Thompson's right to reasonable medical care; 6) whether Tefteller failed to properly supervise or train his staff; 7) whether the alleged lack of supervision or training caused the alleged violation of Thompson's rights; and 8) whether Tefteller's alleged failure to supervise or train constituted deliberate indifference to Thompson's right to reasonable medical care.

Similarly, in his order regarding Cross and Whorton, the Magistrate ruled that the following "fact issues" prevented qualified immunity from protecting Cross and Whorton: 1) whether Thompson was capable of determining his medical needs; 2) whether Whorton received medical advice from a nurse at East Texas Medical Center as to Thompson's care; 3) whether Cross failed to properly supervise or train his staff; 4) whether the alleged lack of supervision or training caused the alleged violation of Thompson's rights; and 5) whether Cross's alleged failure to supervise or train amounted to deliberate indifference to Thompson's right to reasonable medical care.

**Discussion**

9

I.   Jurisdiction

The denial of a motion for summary judgment based on qualified immunity is immediately appealable notwithstanding that such denial was premised upon the existence of "[m]aterial issues of fact". *Behrens v. Pelletier*, 116 S.Ct. 834, 842 (1996); *Colston v. Barnhart*, 146 F.3d 282, 284 (5th Cir. 1998). On such an interlocutory appeal, this Court does not have jurisdiction to review the district court's finding that particular factual issues are "genuine," that is that the summary judgment evidence would support a particular finding of fact. *Behrens*, 116 S.Ct. at 842; *Johnson v. Jones*, 115 S.Ct. 2151, 2159 (1995); *Colston*, 146 F.3d at 284. However, this Court does have jurisdiction to review the magistrate's determination that certain facts (or factual disputes) are "material" to the issue of qualified immunity. *White v. Balderama*, 153 F.3d 237, 240 (5th Cir. 1998); *Colston*, 146 F.3d at 284-85. The scope of clearly established law and the objective reasonableness of those acts of the defendant that the district court found the plaintiff could prove at trial are legal issues we review *de novo*. *Johnson*, 115 S.Ct. at 2156, 59; *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999); *Balderama*, 153 F.3d at 242; *Colston*, 146 F.3d at 285 n.2.[7]

_____

[7]See also, e.g., *Hare v. City of Corinth, Ms.*, 135 F.3d 320 at 328 (5th Cir. 1998) (*Hare III*) ("objective reasonableness is a question of law for the court"); *Pierce v. Smith*, 117 F.3d 866, 871 (5th Cir. 1997) ("[T]o the extent that the relevant discrete, historic facts are undisputed . . . the question of the objective reasonableness of the

10

Ideally, the district court's order denying summary judgment based on qualified immunity explains what facts the plaintiff may be able to prove at trial, i.e. what particular facts the court assumed in denying summary judgment urged on the basis of qualified immunity. This facilitates appellate review by allowing this Court to focus on the aforementioned purely legal issues. When, as is true to some extent here, the court below fails to do this and, instead, denies the motion simply because "fact issues" remain, this Court has two choices. We can either scour the record and determine what facts the plaintiff may be able to prove at trial and proceed to resolve the legal issues, or remand so that the trial court can clarify the order. *Behrens*, 116 S.Ct, at 842; *Johnson*, 115 S.Ct. at 2159; *Glenn v. City of Tyler*, 2001 WL 102270, *3 (5th Cir. February 22, 2001); *Wagner v. Bay City, Texas*, 227 F.3d 316, 320 (5th Cir. 2000); *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000); *Balderama*, 153 F.3d at 242; *Colston*, 146 F.3d at 285-86 & nn. 2-3. We do not believe remand is necessary here.

II. Standard for Entitlement to Qualified Immunity

The doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions if the official's acts were

---

defendant's conduct-*i.e.*, whether at the time and under the circumstances all reasonable officials would have realized the particular challenged conduct violated the constitutional provision sued on-is . . . a question of law").

objectively reasonable in light of then clearly established law. *Harlow v. Fitzgerald*, 102 S.Ct. 2727, 2738 (1982).

As we said in *Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997):

> "Where, as here, a section 1983 defendant pleads qualified immunity and shows he is a governmental official whose position involves the exercise of discretion, the plaintiff then has the burden 'to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law.' *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992). We do 'not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs.' *Id.*"

The first step in the qualified immunity analysis is to determine whether the plaintiff has alleged the violation of a clearly established federal constitutional (or federal statutory) right. *Hare v. City of Corinth,* 135 F.3d 320, 325 (5th Cir. 1998) (*Hare III*); *Pierce*, 117 F.3d at 872. If the plaintiff does so, the Court must then assess whether the defendant's conduct was objectively reasonable in light of clearly established law. *Hare III*, 135 F.3d at 326; *Pierce*, 117 F.3d at 872. Unlike the first step, the step two inquiry applies the law that was clearly established at the time of the alleged violation. To ensure that qualified immunity serves its intended purpose, it is of paramount import, during step two, to define "clearly established law" at the proper level of generality. *Anderson v. Creighton*, 107 S.Ct. 3034, 3039 (1987); *Petta v. Rivera*, 143 F.3d 895, 899 (5th Cir. 1998);

12

*Pierce*, 117 F.3d at 872.

"Clearly established" means that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 107 S.Ct. at 3039. The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff. *Id*. at 3040; *Malley v. Briggs*, 106 S.Ct. 1092, 1096 (1986); *Pierce*, 117 F.3d at 871. The "defendant's circumstances" includes facts know to the defendant. However, because qualified immunity turns only upon the *objective* reasonableness of the defendant's acts, a particular defendant's subjective state of mind has no bearing on whether that defendant is entitled to qualified immunity. *Anderson*, 107 S.Ct. at 3040; *Pierce*, 117 F.3d at 871 n.5. An official is eligible for qualified immunity even if the official violated another's constitutional rights. *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000); *Pierce,* 117 F.3d at 872.

III. Constitutional Right to Reasonable Medical Care

Plaintiffs correctly observe that pretrial detainees have a constitutional right, under the Due Process Clause of the Fourteenth Amendment, not to have their serious medical needs met

13

with deliberate indifference on the part of the confining officials. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Hare v. City of Corinth*, 74 F.3d 633, 636 (5th Cir. 1996) (*en banc*) (*Hare II*); *Lancaster v. Monroe County,* 116 F.3d 1419, 1426 (11th Cir. 1997); *Colle v. Brazos County, Texas*, 981 F.2d 237 (5th Cir. 1993); *Fielder v. Bosshard*, 590 F.2d 105, 107 (5th Cir. 1979). *Lancaster*, *Colle* and *Fielder* establish that delirium tremens is a serious medical need.

In *Fielder*, a request by the prisoner's mother to the jailer that he receive medical attention for delirium tremens was followed by a request from the prisoner himself. *Fielder* 590 F.2d at 108. These requests were ignored, the jailers stating that they thought the prisoner was "faking." *Id*. This evidence was sufficient to support the jury's verdict for the plaintiff. *Id*.

*Colle* reversed the district court's dismissal of the plaintiff's complaint and held that the plaintiff properly alleged a constitutional violation by asserting that the sheriff: 1) staffed the jail with persons who did not have the authority to transfer a detainee to the hospital; and 2) had a policy of failing to monitor the serious health needs of detainees. *Colle,* 981 F.2d at 245. The sheriff's jailers *failed to call* for medical assistance as the condition of an inmate they knew to be suffering from delirium tremens worsened. *Id*. at 240.

*Lancaster* reversed the district court's grant of summary

14

judgment based on defendants' entitlement to qualified immunity and held that either a "total failure" to provide or an exacerbating delay in providing life saving medical treatment to a detainee suffering from DTs was a violation of constitutional rights. *Lancaster,* 116 F.3d at 1425-28. The court cited *Fielder* for the proposition that DTs was recognized as a serious medical need. *Id.* at 1426. *Lancaster* established that ignoring the dangers of alcohol withdrawal and waiting for a "manifest emergency" before summoning medical help constituted deliberate indifference.[8] The facts in *Lancaster* were particularly egregious because the detainee's wife and father had informed a jailer and the sheriff that the detainee was a chronic alcoholic, would suffer DTs, and would need immediate help if he had a seizure.

Plaintiffs rely most heavily upon *Weaver v. Tipton County, Tennessee*, 41 F.Supp.2d 779, 782 (W.D. Tenn. 1999). In *Weaver*, a prisoner who had a history of seizures and alcohol withdrawal appeared to have a seizure and was told he was going to be taken to the hospital. The prisoner stated that he was fine and that a trip to the hospital was unnecessary. The next day a psychologist told the jailer the prisoner needed to be taken to the emergency room.

---

[8]*Id.* The *Lancaster* court appears to have melded or confused deliberate indifference (the standard for § 1983 liability) with objective reasonableness (the standard for entitlement to qualified immunity). In this circuit, the concepts, though related, are distinct. *Hare III*, 135 F.3d at 327-38. Nevertheless, we believe *Lancaster* supports the proposition that delaying medical treatment for a detainee suffering from DTs until a crisis occurs is objectively unreasonable.

The prisoner was never taken to the emergency room and was never again offered a trip to the hospital. He died six days after entering the jail, four days after initially refusing a trip to the hospital. The jailers moved for summary judgment solely on the basis of qualified immunity. The district court denied the motion because it concluded that, in the Sixth Circuit, when a plaintiff alleges deliberate indifference to a prisoner's needs, the defense of qualified immunity is precluded. *Id*. at 785. The district court noted its disagreement with the Sixth Circuit's construction of *Farmer v. Brennan*, 114 S.Ct. 1970 (1994), in this respect, and likewise indicated its agreement with the Fifth Circuit's opinion in *Hare III*, which held that the defense of qualified immunity is not precluded by a deliberate indifference claim. *Weaver*, 41 F.Supp.2d at 785 n.5.

Plaintiffs' reliance upon *Weaver* is misplaced. *Weaver*, in obedience to its understanding of Sixth Circuit law, merely concluded that an allegation of deliberate indifference precluded the defense of qualified immunity without reference to whether the conduct of the defendant was objectively reasonable, contrary to the law of this circuit. Moreover, *Weaver* is not only a decision of a district court outside of this circuit, and not a decision of this Court, but it was handed down almost eighteen months after Thompson died, and cannot be considered part of any body of law that was *then* clearly established.

16

IV.  Standards for Section 1983 Liability

A.  Individual

Deliberate indifference in the context of an episodic failure to provide reasonable medical care to a pretrial detainee means that: 1) the official was aware of facts from which an inference of substantial risk of serious harm could be drawn; 2) the official actually drew that inference; and 3) the official's response indicates the official subjectively intended that harm occur. *Hare II,* 74 F.3d at 643, 649-50.  However, deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm.  *Id.* at 645, 49.

B.  Supervisory

"Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987).  A sheriff not personally involved in the acts that deprived the plaintiff of his constitutional rights is liable under section 1983 if: 1) the sheriff failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights. *Smith v. Brenoettsy*, 158 F.3d 908, 911-12 (5th Cir. 1998); *Doe v.*

17

*Taylor Independent School District*, 15 F.3d 443, 452-54 & nn.7-8 (5th Cir. 1994) (*en banc*) (adopting the *City of Canton v. Harris*, 109 S.Ct. 1197, 1205 n.10 (1989), standard of municipal liability for supervisory liability, thus omitting gross negligence from the *Hinshaw* test); *Hinshaw v. Doffer*, 785 F.2d 1260, 1263 (5th Cir. 1986).

Proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference. *Snyder v. Trepagnier*, 142 F.3d 791, 798-99 (5th Cir. 1998); *Belt*, 828 F.2d at 304-305. The plaintiff must generally demonstrate at least a pattern of similar violations. *Snyder*, 142 F.3d at 798. Furthermore, the inadequacy of training must be obvious and obviously likely to result in a constitutional violation. *City of Canton*, 109 S.Ct. at 1205 n.10 (1989); *Snyder v. Trepagnier*, 142 F.3d at 799. Standing alone, an expert's opinion is generally not enough to establish deliberate indifference. *Id*.

V.   Qualified Immunity Standard Applied Here

  A.   Allegation of a Constitutional Violation

Plaintiffs allege that Tefteller and Whorton were deliberately indifferent to the serious health needs of Thompson and that Tefteller and Cross promulgated or failed to promulgate policies that manifest their deliberate indifference toward the serious

18

medical needs of their detainees.  Plaintiffs have satisfied their burden to allege, at a high level of generality, a constitutional violation.  It remains whether defendants' acts were objectively reasonable in light of clearly established law.

B.    Objective Reasonableness of Defendant's Acts

At the outset, we highlight the importance of appreciating the difference between the objective reasonableness standard for qualified immunity set forth in Part II, *supra*, and the subjective deliberate indifference standard for section 1983 liability set forth in Part IV, *supra*.  These standards are often confused.  *See Hare III*, 135 F.3d at 327-28.  Examples of behavior that does (and does not) constitute deliberate indifference are relevant in assessing the scope of clearly established law and, therefore, are relevant in determining whether the defendants' actions were objectively reasonable.  *Id*.  However, when the defendant moves for summary judgment based on qualified immunity, it is the plaintiff's burden to demonstrate that all reasonable officials similarly situated would have then known that the alleged acts of the defendants violated the United States Constitution.  *Pierce*, 117 F.3d at 872.  That is different from the burden of establishing a genuine issue as to the defendant's deliberately indifferent subjective state of mind.

When assessing the scope of clearly established law for step two, it is necessary to articulate the asserted constitutional

19

right more specifically.

### 1.    Sheriff Tefteller

In his order denying Tefteller's motion for summary judgment, the Magistrate identified several issues of fact deemed to be genuine respecting Tefteller's ultimate section 1983 liability. However, many of the "fact issues" relevant to qualified immunity involved questions of law, e.g., whether Tefteller had a duty under then current law to force Thompson to undergo medical treatment. The section of the order devoted to the objective reasonableness of Tefteller's actions is very short and ends with the statement that "fact issues exist as to the objective reasonableness of Sheriff Tefteller's acts and/or omissions . . . ." The order identifies various assertions of the parties but does not specifically identify what particular facts the magistrate assumed to be both genuinely disputed and material in that respect. Nor does the magistrate actually find that Tefteller's actions were not objectively reasonable, merely that unspecified "fact issues" existed in that respect. Tefteller challenges the materiality of the "fact issues", including Thompson's competence, and urges that his undisputed actions were objectively reasonable in light of clearly established law.

As to the scope of clearly established law, the question is whether an unmarried adult, under no guardianship or finding of incompetency, who is a pretrial detainee at the jail of a small rural county, holding him on transfer from and as accommodation to

20

a larger neighboring county where he is charged and was arrested for DWI, and who while at the smaller county jail becomes delusional and hallucinatory from DTs, has a clearly established constitutional right to have his jailers at the smaller county either force him to submit to medical care for his DTs against his clearly communicated refusal to do so, or make reasonable efforts to locate a substitute decision maker, in lieu of promptly returning him to the custody of the larger county's jail from which he was transferred and which has detoxification facilities the smaller county's jail lacks.

As explained in Part III, *supra*, clearly established law prevents a jailer from responding to a serious medical need with deliberate indifference. However, neither *Fielder*, *Lancaster*, nor *Colle* clearly established that any jailer–much less one whose status respecting the inmate is analogous to that of the Marion County jail respecting Thompson--must either force a conscious, incompetent, but clearly refusing inmate to undergo medical treatment or seek a surrogate decision-maker for the same.[9]

---

[9]As we stated in *Pierce*, 117 F.3d at 882:

"We . . . recognize that the egregiousness and outrageousness of certain conduct may suffice to obviously locate it within the area proscribed by a more general constitutional rule: 'there has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability . . .' *K.H. Through Murphy* [*v. Morgan*, 914 F.2d 846] at 851 [7th Cir. 1990]. But the same common sense which informs this teaching likewise prevents

21

Neither is there any statutory duty to *impose* medical care or locate a surrogate in these or similar circumstances.

Tex. Health & Safety Code Ann. § 313.004 (West 2000) requires a reasonably diligent search for a surrogate only for adult patients in hospitals or nursing homes who are "comatose, incapacitated, or otherwise mentally or physically incapable of communication...."

Tex. Health & Safety Code Ann. § 551.041 (West 2000) applies to mental institutions and requires consent of three licensed physicians before medical care is imposed.

Notwithstanding that clearly established law does not require the imposition of medical care or the location of a surrogate decision-maker, this Court must still query whether Tefteller's actions were objectively reasonable in light of that law that was then clearly established.

The materiality of Thompson's competence when he refused treatment is disputed. In addition, the plaintiffs claim Thompson

---

its expansion to the point of rendering qualified immunity an insignificant aberration or infringing on the settled doctrine that '[i]t is not enough, to justify denying immunity, that liability in a particular constellation of facts could have been, or even that it was, predicted from existing rules and decisions. . . . Liability in that particular set [of facts] must have been established at the time the defendant acted.' *Id.* As the en banc Eleventh Circuit stated in *Lassiter* [*v. Alabama A&M University*, 28 F.3d 1146 (11th Cir. 1994)]: 'For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*.' *Id*. at 1150."

was forced to sign the release form, but there is no evidence of that and the magistrate did not identify that as a genuine issue of fact.

Viewing the facts most favorably to the plaintiffs, Thompson was disoriented and experienced hallucinations throughout Thursday morning but was able to and did clearly communicate refusals when repeatedly invited to be transported to the hospital. Thompson also signed a voluntary refusal of treatment form. While these facts support a finding that Thompson was generally incompetent Thursday morning, the undisputed facts of clearly communicated refusal to consent and signing of the treatment form cannot be ignored when considering the objective reasonableness of Tefteller's policies and personal involvement with Thompson. Put another way, it would be improper to consider only the fact of Thompson's incompetence and not what Thompson actually said and did.

Unless all reasonable sheriffs would recognize the unconstitutionality of failing to instruct their staffs to impose medical care or locate a surrogate decision-maker in situations where the adult detainee is disoriented and hallucinating from DTs but repeatedly and clearly communicates refusal of medical care and signs a form refusing treatment, Tefteller's actions were objectively reasonable, particularly given the prompt action to return Thompson to Upshur County. Given the absence of even a single case constitutionally requiring the imposition of medical

23

care or location of a surrogate in this or any similar context, it cannot be said that all reasonable sheriffs would recognize the unconstitutionality of Tefteller's supervisory or personal acts or omissions.[10]

Because neither of the rights Thompson asserts were clearly established at the time of his death, chief jailer Bolick's actions were objectively reasonable. At virtually the first sign of a serious threat to Thompson's health, she summoned an ambulance and shortly thereafter transferred Thompson to a jail that she believed would provide closer supervision. Clearly established law required no more. This confirms that Tefteller's acts in training and supervising his staff were objectively reasonable and that sheriff Tefteller's personal involvement with Thompson was objectively

---

[10]Tefteller relies upon two United States Supreme Court decisions, *Cruzan v. Director of Missouri Department of Health*, 497 U.S. 261 (1990), and *Bowen v. American Hospital Association*, 476 U.S. 610 (1986), for the proposition that he was *required* by law to honor Thompson's request not to be given medical treatment.

There is no question that a competent person has a "liberty interest...in refusing unwanted medical treatment." *Cruzan*, 497 U.S. at 262. But here, plaintiffs claim Thompson was not competent. *Cruzan* does nothing more than *allow* a state to require clear and convincing evidence that the decisions of the surrogate decision-maker are consistent with the desires of the incompetent patient. In *Cruzan* the surrogate demanded that food and hydration be *withheld*.

Tefteller's actions were objectively reasonable because under all the circumstances here clearly established constitutional law did not require him to impose medical care or locate a surrogate, not merely because of the absence of informed consent. Again, in reaching this conclusion it is necessary to look beyond the assumed actual incompetence of Thompson and consider what he actually said and did as well as the other circumstances.

reasonable.[11]  Thus, based on his own acts and the acts of his staff, Sheriff Tefteller is entitled to qualified immunity.

>        2.    Sheriff Cross

The magistrate's order denying sheriff Cross's and Sgt. Whorton's motion for summary judgment suffers from infirmities similar to those in his order denying sheriff Tefteller's motion.

Plaintiffs do not allege that sheriff Cross was personally aware of Thompson's situation until after he died.  Thus, the issue as to sheriff Cross's claim of qualified immunity is whether his policies were objectively reasonable in light of then clearly established law. Plaintiffs do not assert that Cross had a policy of ignoring or failing to monitor the medical needs of detainees.  Plaintiffs allege that Cross failed to provide medical training to his staff, including failure to inform jailers of the serious health risks posed by DTs.  Plaintiffs point to Sgt. Whorton's admissions in her deposition that she had no medical training and was not aware that DTs was a serious medical need that could result in death.

*Fielder* and *Lancaster* establish that DTs is a serious medical need and *Colle* denied qualified immunity when policies were in place that prevented serious medical needs (in *Colle*, DTs) from being met.  These cases do not clearly establish that sheriffs must provide medical

---

[11]Sheriff Tefteller is also entitled to qualified immunity in his capacity as Marion County policymaker for the same reasons that sheriff Cross is entitled to qualified immunity in his capacity as Upshur County policymaker, as discussed *infra*.

training on the dangers posed by DTs, only that they not have policies in place that preclude serious medical needs, like DTs, from being met. Plaintiffs have not identified any policies promulgated by sheriff Cross (or by Tefteller) that would deny or even impede the prompt provision of medical care to a detainee in distress. Plaintiffs have not identified any law that requires a sheriff or police chief to educate his staff on the dangers of DTs or any of Cross's (or Tefteller's) policies that would impair the provision of timely medical assistance to inmates suffering DTs.

We note in this connection that there is no evidence that inmates in either Upshur County or Marion County had ever previously suffered adverse serious health problems which the jail personnel handled inappropriately. Nor is there any evidence that either jail had previously had any inmates who suffered adverse consequences from the delay or failure of jail personnel to furnish or procure medical treatment for DTs or the like or from the failure of jail personnel to recognize either the potential seriousness of an inmate's DTs or that an inmate, though able to adequately communicate refusal of medical treatment, was incompetent to so refuse. Nor is there any evidence of the extent or frequency either in Texas generally or in the nation as a whole of instances in which jail inmates suffered any serious adverse consequences from the failure of jail personnel to recognize the potential dangerousness of an inmate's DTs or that an inmate with DTs though able to adequately communicate refusal of medical treatment was incompetent to do so, or in which the failure to train jail personnel

26

respecting the medical seriousness of DTs was seriously harmful to inmates.  In these circumstances, and given the lack of precedent on the matter, we conclude that not all reasonable sheriffs situated similarly to either sheriff Cross or sheriff Tefteller would realize that the *United States Constitution required* them to have their jail personnel medically trained respecting the likely medical seriousness of an inmate suffering from DTs and the need to have such an inmate promptly receive medical care or respecting the inability of such an inmate to legally or competently refuse medical treatment despite being able to adequately communicate such refusal.  The failure of the sheriffs to furnish such training cannot reasonably be analogized to welfare officials selling foster children into slavery (see note 9, supra), at least not so long as the doctrine of qualified immunity is to retain any significance beyond the strictly aberrational or symbolic.

Sheriff Cross's challenged actions and inaction in promulgating policies has not been shown to be other than objectively reasonable, and Cross is entitled to qualified immunity.

While the issues of qualified immunity and deliberate indifference are separate and distinct, we note that, as a matter of law, plaintiffs could not succeed in showing that sheriff Cross, in his role as Upshur county policymaker, was deliberately indifferent to the serious medical needs of Thompson.  Our precedent makes clear that deliberate indifference on the part of a policymaker cannot generally  be shown from a single violation of constitutional rights or expert testimony.

27

*Snyder v. Trepagnier*, 142 F.3d 791, 798-99 (5th Cir. 1998). As noted above, no more than the single incident made the basis of this suit has been shown here.

### 3. Sgt. Whorton

Clearly established law forbids a significantly exacerbating delay or a denial of medical care to a detainee suffering from DTs. Therefore, for her conduct to be objectively reasonable, Sgt. Whorton's acts must not have resulted in either. Whorton was aware that: 1) Thompson's blood alcohol level was over 0.3% when he was arrested; 2) Thompson was hallucinating and, at times, speaking incoherently; 3) Thompson was injuring himself in his cell; and 4) Thompson was experiencing DTs. She responded to this situation in a variety of ways: 1) close observation of Thompson; 2) placing Thompson in a straight jacket (but without the helmet kept available for that sort of situation); 3) dressing a wound on Thompson's head; 4) placing mattresses in Thompson's cell; 5) calling the hospital to ask for medical advice, though we must assume for purposes of this interlocutory appeal that no medical advice was obtained; and 6) instructing jailer Bishop not to summon medical help for Thompson unless she was contacted and not to contact her unless Thompson was dying.

None of these responses involved arranging for professional medical assistance for Thompson's serious medical need—DTs. In fact, jailer Bishop's affidavit indicates that Whorton's instructions prevented her from summoning medical help after Whorton's shift ended. We believe

that in light of clearly established law, all reasonable jailers would have recognized the constitutional obligation to summon medical assistance well before Thompson died, at least on the magistrate judge's assumption that Whorton did not receive the advice she claimed to have. Further, again at least on the same assumption, we believe that all reasonable jailers would have recognized the constitutional obligation not to instruct her subordinates not to disturb her at home or summon an ambulance unless a detainee was on the verge of death. To that extent the law was clearly established. We do not believe that Thompson's refusal of medical care in Marion County could be reasonably understood to absolve Whorton of her constitutional duty to summon professional medical assistance several hours later or justifies her imposition of the verge of death standard for the provision of professional medical assistance. Accepting, as we now must, the facts which the magistrate deemed genuinely in dispute, we cannot find error in the denial of Whorton's motion for summary judgment on the basis of qualified immunity.

Of course, this does not mean that Whorton in fact acted with deliberate indifference. Whorton may have subjectively intended that Thompson be harmed (deliberate indifference) or she may have negligently (or grossly negligently) believed that his DTs was not a serious medical need then calling for other response on her part. The issue of Whorton's state of mind is for the trier of fact, assuming (as we must on this interlocutory appeal, though *not* on appeal after an adverse

29

final judgment) that a jury could find the facts respecting Whorton as the magistrate judge assumed.

VI.  Plaintiffs' Texas Tort Claims Act Claim

Sheriff Tefteller does not address the magistrate's denial of his motion for summary judgment on plaintiffs' Texas Tort Claims Act claim. Thus, we cannot disturb the magistrate's disposition of that motion. However, the district court would be within its discretion to dismiss, without prejudice, the remaining claims against sheriff Tefteller because the section 1983 claim that provided the basis of federal jurisdiction must be dismissed with prejudice.[12]

## Conclusion

Sheriffs Tefteller and Cross are entitled to qualified immunity because their conduct has not been shown to be other than objectively reasonable in light of clearly established law.  Sgt. Whorton has not, given the assumptions we must make on this interlocutory appeal, demonstrated error in the denial of her motion for summary judgment. Accordingly, we REVERSE the magistrate's denials of sheriff Tefteller's and sheriff Cross's motions for summary judgment based on qualified immunity.  We AFFIRM the magistrate's denial of Sgt. Whorton's motion for summary judgment based on qualified immunity.

AFFIRMED in part, and REVERSED in part

---

[12]This would also apply to Cross.  The magistrate judge has not ruled on the defense motions respecting the state law claims against Cross and Whorton, so they are not before us.