**Phillip THOMPSON, TDCJ ID # 834413, Plaintiff,**

v.

**Robert EASON, et al., Defendants.**

**No. CIV. A. 1:01–CV–068–.**

United States District Court, N.D. Texas, Abilene Division.

March 28, 2003.

---

Phillip Thompson, Cuero, TX, Pro se.

Cari Gaye Bernstein, Attorney General of Texas, Austin, TX, for Defendants.

### ORDER

CUMMINGS, District Judge.

Plaintiff, Phillip Thompson, acting *pro se*, filed a civil rights complaint pursuant to 42 U.S.C. § 1983, alleging employees of the Texas Department of Criminal Justice, Institutional Division ("TDCJ–ID") French Robertson ("Robertson") Unit retaliated against him, failed to protect him from assaults and threats by prison gang members, and interfered with his constitutional right to practice his religion. Thompson seeks injunctive relief, declaratory relief, and monetary damages.

## BACKGROUND

On April 18, 2001, Thompson and Carl Davis, acting jointly, filed a civil rights complaint in the United States District Court for the Northern District of Texas, Abilene Division, which was assigned Civil Action No. 1:01–CV–062–C. By Order dated April 27, 2001, this Court determined that the two plaintiffs were not incarcerated in the same TDCJ–ID unit and ordered that their claims be severed "because of concerns of the possibility of transfer, release, security, and the need for each individual plaintiff to represent himself." Thompson's claims were assigned Civil Action No. 1:01–CV–068–C and he was ordered to file an Amended Complaint providing the "specific facts regarding the alleged constitutional violations and ... information regarding his attempt to resolve the problems through the administrative grievance procedures."

Thompson was granted permission to proceed *in forma pauperis* by Order dated May 17, 2001.

Thompson filed his Amended Complaint on July 2, 2001, and named the following defendants: Gary Johnson, "agent" for the TDCJ–ID; Robert Eason, Assistant Warden of the Robertson Unit; Cary Cook, Assistant Warden of the Robertson Unit; Ronald Gloyd, IAD Investigator at the Robertson Unit; Joe D. Trumbo, Sergeant at the Robertson Unit; Gregory H. Oliver, Major at the Robertson Unit; Mark T. Lipiecki, CO–IV at the Robertson Unit; James Pruett, garment factory employee at the Robertson Unit; Bucky Sherly, garment factory employee at the Robertson Unit; and NFN Kocher, Building Sergeant at the Robertson Unit.[1] On July 5,

---

1. Thompson named Sally E. McDonald, Richard A. Avants, Renee L. Weems, Richard Deal, Judy Sloan, and Florent Luc Litalien in the original complaint, but he did not name these TDCJ–ID employees as defendants when he filed his Amended Complaint. Accordingly, the Court finds that these Defendants should be dismissed from the complaint. *See*

2001, Thompson's complaint was referred to the United States Magistrate Judge for screening pursuant to 28 U.S.C. §§ 1915 and 1915A.

The United States Magistrate Judge conducted an evidentiary hearing and judicial screening by televideo conferencing on September 18, 2001. *See Spears v. McCotter,* 766 F.2d 179 (5th Cir.1985) (authorizing an evidentiary hearing for a prisoner plaintiff proceeding *pro se* to expound upon his written complaint). Thompson did not consent to have the Magistrate Judge hear his complaint; therefore, the case was transferred back to the docket of this Court by Order dated September 20, 2001.

By Order dated October 16, 2001, Defendants TDCJ–ID, Eason, Cook, Gloyd, Trumbo, Oliver, Lipiecki, Pruett, Sherly, and Kocher were ordered to file an answer or responsive pleading. Defendants Eason, Cook, Gloyd, Trumbo, Oliver, Lipiecki, Pruett, Sherly, and Kocher filed an Answer and partial motion to dismiss on February 4, 2002, and Defendant TDCJ–ID filed a Motion to Dismiss on March 15, 2002. Defendants Eason, Cook, Gloyd, Trumbo, Oliver, Lipiecki, Pruett, Sherly, and Kocher unequivocally denied the allegations of retaliation and failure to protect and asserted claims to the defense of qualified immunity. Defendant TDCJ–ID asserted the defense of sovereign immunity.

By Order dated August 30, 2002, Defendant TDCJ–ID was dismissed as a party to the complaint and the caption of the complaint was changed to PHILLIP

THOMPSON v. ROBERT EASON, CARY J. COOK, RONALD GLOYD, JOE D. TRUMBO, GREGORY H. OLIVER, MARK T. LIPIECKI, OFFICER PRUETT, BUCKY SHERLY, AND NFN KOCHER. The partial motion to dismiss by Defendants Eason, Cook, Gloyd, Trumbo, Oliver, Lipiecki, Pruett, Sherly, and Kocher was denied because Thompson had requested prospective injunctive and declaratory relief. *See Aguilar v. Texas Dept. of Criminal Justice,* 160 F.3d 1052, 1054 (5th Cir.1998) (holding that when a suit alleges a violation of federal law against an individual in his official capacity as an agent of the state and seeks declaratory and injunctive relief, the individual is not entitled to sovereign immunity under the Eleventh Amendment).

A scheduling order was subsequently entered and Thompson's complaint was set for trial on April 7, 2003.

On December 16, 2002, Thompson and the Defendants filed an Agreed Stipulation of Partial Dismissal with Prejudice asking that Thompson's request for injunctive relief regarding his religious claims be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii).

On January 22, 2003, Defendants Eason, Cook, Gloyd, Trumbo, Oliver, Lipiecki, Pruett, Sherly, and Kocher filed a Motion for Summary Judgment with Brief in Support[2] and an Appendix ("App.") which contained authenticated copies of Thompson's prison records and parts of Thompson's

---

*Eason v. Holt,* 73 F.3d 600, 603 (5th Cir.1996) (noting that it is well settled in the Fifth Circuit that an amended complaint supersedes the original complaint); *King v. Dogan,* 31 F.3d 344, 346 (5th Cir.1994) ("An amended complaint supersedes the original complaint and renders it of no legal consequence unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading.").

**2.** Defendants were allowed to file an Amended Motion for Summary Judgment and an Amended Brief in Support thereof on March 12, 2003, because they had omitted the name of Defendant Oliver from the style and prayer for relief in the original motion and brief. All references hereinafter to the Motion for Summary Judgment shall be to Defendants' Amended Motion and Brief filed on March 12, 2003.

oral deposition. Thompson has not filed a response.

## PLAINTIFF'S COMPLAINT [3]

Thompson alleges that he was transferred to the TDCJ–ID Robertson Unit on January 4, 2000, and within three weeks of his arrival, he was assaulted by a member of a prison gang.[4] As a result of this assault, Thompson was moved from Building 3 to Building 4 and his work assignment was changed from the laundry to the garment factory. After he spent about three or four months in Building 4, Thompson was moved to the "Dorms," but he continued to work in the garment factory.

On August 19, 2000, Thompson witnessed TDCJ–ID officers search the cell of inmate Carl Davis and seize his typewriter. Davis advised Thompson that the officers had subsequently filed a false disciplinary case against him, and Thompson agreed to testify for Davis when he filed his civil rights complaint in federal court. Thompson alleges that after he agreed to testify for inmate Davis, the Defendants failed to protect him from assaults and threats by prison gangs and that some of the Defendants acted in retaliation for his agreeing to testify for inmate Davis because they did not like inmate Davis.

Thompson's first life-endangerment complaint at the Robertson Unit was investigated by Defendant Trumbo, but he alleges that after the initial investigation, Trumbo did nothing to protect Thompson from future threats and assaults by other prison inmates. Thompson also contends that Defendant Gloyd investigated another life-endangerment complaint he filed, but he argues that Defendant Gloyd did nothing to insure his safety other than send some "gang investigators" to interview Thompson and investigate the complaint.

Thompson alleges that on December 7, 2000, he was assaulted in his cell in Building 19 by three gang members—Larry Lucky, Wallace, and Dice. These gang members allegedly punched him with their fists and kicked him in his face, ribs, and body. Although Thompson reported the assault to Defendant Kocher, Kocher simply gave him a towel for his bloody nose and refused to take him to the infirmary. Thompson concedes that he suffered only superficial cuts and bleeding, he did not file a sick call request, and his injuries healed without medical treatment. Thompson also argues that Defendant Kocher did not report the assault or take any steps to protect him from future assaults and threats by gang members.

Thompson next complains that when he reported to work in the prison garment factory on December 11 or 12, 2000, he told Defendants Pruett, Sherly, and Lipiecki about the assault and asked for protection. He alleges that he continued to ask for protection until December 14, 2000, and even though Defendants Pruett and Sherly observed gang members threaten him in the garment factory during this time period, they refused to take any action to insure Thompson's safety.

---

3. This Court has reviewed the videotape of the *Spears* hearing conducted by the Magistrate Judge on September 18, 2001. Thus, "Plaintiff's Complaint" includes the allegations raised in Thompson's Amended Complaint and the statements that he made under oath at the *Spears* hearing. *See Eason v. Holt*, 73 F.3d at 603 (holding that a plaintiff's testimony at a *Spears* hearing becomes part of his pleadings).

4. Throughout his complaint and deposition, Thompson complains that various gang members were threatening and assaulting him. Although he states that they were members of the Bloods, Crips, and Aryan Brotherhood, Thompson never specifically explains which inmate is a member of which gang.

Thompson contends that he specifically advised Defendant Pruett on December 14, 2000, that he could not go to the bathroom in the garment factory because he had been told that the gang members would be waiting there for him. Thompson alleges that he observed Defendant Pruett talk to inmate Burgess, one of the inmates that had previously assaulted him on December 7, and that Burgess later told Thompson that Defendant Pruett had told the inmates that Thompson was a "snitch." Thompson also alleges that Defendant Pruett was aware of the threats and intimidation because his desk was just in front of Thompson's work station and he could see the gang members coming by and threatening Thompson.

Thompson contends that Defendants Pruett and Sherly failed to take any steps to insure his safety in retaliation for the assistance he gave to Carl Davis. Although neither Pruett nor Sherly was named as a defendant in Davis's suit, the officers did not like Davis because he filed so many complaints and lawsuits. Thompson also vaguely argues that Defendants Trumbo, Gloyd, and Kocher deliberately ignored his requests for protection in retaliation for the support he provided Carl Davis.

Thompson alleges that he was called before the Robertson Unit Classification Committee ("UCC") on December 20, 2000. Defendant Oliver presided over this meeting and ordered Thompson transferred to Building 3, Pod C, Cell 58. Thompson argues that he refused to move because several of the gang members that had assaulted and threatened him lived in Building 3. Thompson alleges that Defendant Oliver refused to listen to his explanation and charged him with a disciplinary infraction (# 20010110458) for refusing to accept the cell assignment.

Thompson was again called before the Robertson UCC on January 17, 2001, and this time he requested a transfer to another unit. After the meeting, Thompson was advised that his request for a transfer had been denied and Defendant Oliver had ordered that he be separated from inmate Burgess and transferred to Building 7. Thompson contends that he had to refuse the cell assignment once again because he feared the gang members on building 7. He was also charged with another disciplinary infraction (# 20010134378) for refusing the cell assignment. Although he was found guilty and punishment assessed, Thompson admits that this disciplinary case was overturned and his good time and line class restored. Thompson contends that Defendant Oliver made the classification decisions on December 20, 2000, and January 17, 2001, without regard for his personal safety and that Defendant Oliver acted in retaliation.

Thompson finally alleges that although Defendants Eason and Cook, both assistant wardens at the Robertson Unit, were made aware of the assaults and threats to his safety by the grievances that he filed, they ignored his complaints and failed to take any action to protect him. Thompson does not specifically complain that Defendants Eason, Cook, or Lipiecki retaliated against him.

## MOTION FOR SUMMARY JUDGMENT

Defendants first argue that Plaintiff Thompson failed to exhaust his administrative remedies with respect to the claims against Defendants Trumbo, Gloyd, Kocher, Eason, and Cook; therefore, the claims against Defendants Trumbo, Gloyd, Kocher, Eason, and Cook should be dismissed pursuant to 42 U.S.C. § 1997e(a).

Defendants next argue that they are entitled to summary judgment on Thompson's failure-to-protect claims because no defendant was made aware of a risk to

Thompson prior to December 7, 2000; Thompson never suffered any physical injury supporting his claim for compensatory damages; Thompson suffered no physical injury as required by 42 U.S.C. § 1997e(e); and there is insufficient evidence to show that any defendant disregarded a known risk of serious harm.

Defendants also argue that they are entitled to summary judgment on Thompson's retaliation claims because he has failed to show that he suffered any physical injury or provide evidence of a retaliatory motive.

Defendants argue that they are entitled to sovereign immunity for Thompson's claims against them in their official capacities as employees of the TDCJ–ID, an agency of the State of Texas.

Finally, Defendants argue that they are entitled to qualified immunity as a matter of law because their conduct was objectively reasonable under all the circumstances.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment permits a court to resolve a lawsuit without conducting a trial if the court determines (1) there is no genuine dispute as to any material facts and (2) the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it might affect the outcome of the suit under the governing law. *Id.* at 248, 106 S.Ct. 2505. A dispute over a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 250, 106 S.Ct. 2505. A district court may consider pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, when ruling on a motion for summary judgment. *Jones v. Collins*, 132 F.3d 1048, 1052 (5th Cir.1998). Although a district court must consider the summary judgment evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmovant, "the nonmoving party may not rest on the mere allegations or denials of [his] pleadings, but must respond by setting forth specific facts indicating a genuine issue for trial." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 735 (5th Cir.2000) (quoting *Rushing v. Kansas City Southern Ry. Co.*, 185 F.3d 496, 505 (5th Cir.1999)).

The party moving for summary judgment must first demonstrate that "there is an absence of evidence to support the nonmoving party's cause." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party satisfies this requirement by either (1) submitting evidentiary documents that negate the existence of some material element of the non-moving party's claim, or (2) merely pointing out the absence of evidence to support the non-moving party's claim, if the non-moving party will bear the burden of proof on that claim at trial. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir.1994). Once the moving party satisfies this initial requirement, the burden shifts to the non-moving party to "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994). If the moving party supports his motion with evidence, the non-moving party cannot simply rely on conclusory legal allegations but must present affirmative evidence in order to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248–255, 106 S.Ct. 2505. *See Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir.1997) (holding that unsupported allegations, affidavits, or depositions merely setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment).

When the non-moving party fails to file a timely response to a proper motion for summary judgment, he cannot satisfy his burden to "designate specific facts showing that there is a genuine issue for trial," and summary judgment must be granted. *Stults v. Conoco, Inc.,* 76 F.3d 651, 656–57 (5th Cir.1996). *See Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998) (quoting *Skotak v. Tenneco Resins,* 953 F.2d 909, 915 n. 7 (5th Cir.1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...")). Although a court may not enter a "default" summary judgment when the non-moving party fails to respond to a motion for summary judgment, the non-moving party is relegated to his unsworn pleadings, which do not constitute summary judgment evidence, and the court may accept the moving party's evidence as undisputed. *Eversley v. MBank Dallas,* 843 F.2d 172, 174 (5th Cir.1988); *Bookman v. Shubzda,* 945 F.Supp. 999, 1002 (N.D.Tex.1996). To the extent, however, that a prisoner-plaintiff's allegations are verified under penalty of perjury, they "are deemed competent summary judgment evidence." *Al–Ra'id v. Ingle,* 69 F.3d 28, 32 (5th Cir.1995).

A district court does not have to limit the basis for summary judgment to the facts listed in a motion for summary judgment but may grant summary judgment on facts not briefed by the moving party if the non-moving party has notice of the issue. *Turco v. Hoechst Celanese Corp.,* 101 F.3d 1090, 1093 (5th Cir.1996).

### FACTS

Because Thompson failed to file a response to Defendants' Motion for Summary Judgment, the facts stated by the moving parties may be accepted as undisputed. *Eversley v. MBank Dallas,* 843 F.2d at 174. This Court has reviewed Thompson's Amended Complaint, the *Spears* testimony, the Defendants' Answers, the Defendants' Motion for Summary Judgment with Brief in Support and Appendix, Thompson's authenticated prison records, and the authenticated portion of Thompson's deposition, and now makes the following findings of fact:

Thompson was transferred to the TDCJ–ID Robertson Unit on January 4, 2000. His work assignment on that day was "unassigned transient" and his housing assignment was 7H13 cell 17.

On January 6, 2000, Thompson's housing assignment was changed to 3B11 and he was assigned to work in the laundry.

On February 1, 2000, Thompson reported that he was involved in an altercation in the laundry that was instigated by inmate Devin Burgess, who was joined by three other white inmates. (App. at 119). Sergeant Joe D. Trumbo investigated the altercation and noted that there were no staff witnesses to the altercation, Thompson suffered no physical injuries, and he had reported no similar incidents. (App.99–100). After the investigation, Trumbo recommended that Thompson be moved to 4 Building and his work assignment changed to the garment factory to prevent further contacts with the inmates that had instigated the altercation. (App. at 102). Thompson signed a waiver stating that

> I am requesting that no further action be taken by the RB Unit regarding my request for safekeeping, administrative segregation protective custody, transfer or other (move).... The situation has been resolved and I no longer require protection/transfer. I understand that the allegations I have made which resulted in this investigation will not be investigated again unless there is new evidence that should warrant another investigation.

By my signature ..., I acknowledge that I have read and understand the above statement and I am signing this statement of my own free will. (App. at 102). Thompson was then moved to 4D21 on February 1, 2000, and he was temporarily assigned to work in the garment factory. On February 2, 2000, Thompson was assigned to work as a sewing machine operator in the garment factory.

On March 21, 2000, Thompson was moved to 19 Building. (App. at 88). As of August 8, 2000, Thompson was still assigned to work as a sewing machine operator in the garment factory and he was still housed on 19 Building. (App. at 88–89).

On August 19 or 20, 2000, Thompson witnessed correctional officers at the Robertson Unit search the cell of inmate Carl Davis and remove his typewriter from the cell. (App. at 22; *Spears* hearing). Thompson states that inmate Davis then informed him that Correctional Officer Gloyd had ordered that Davis be falsely charged with a disciplinary case for forging a court document. (App. at 23). When Davis asked Thompson if he would give Davis an affidavit about what he had seen and give testimony if needed when Davis filed his civil rights complaint, Thompson agreed to be a witness. (App. at 23). Thompson believes that this occurred around November 1, 2000. (App. at 24).

Thompson alleged that he was assaulted in his cell on 19W (19 Building West Wing) on Thursday, December 7, 2000, by inmates identified only as "Lucky, Wallace, and Dice." (App. at 25, 120; *Spears* hearing). The inmates hit Thompson in his face with their fists and kicked him in his ribs and body with their boots. (App. at 25). Although Thompson reported the assault to Sergeant Kocher and was given a towel for his bleeding, Kocher refused to take him to the infirmary. (App. at 109,

120; *Spears* hearing). Thompson suffered superficial scrapes and cuts but he did not file a sick call request that day or later. (App. at 26). Sergeant Kocher advised Thompson at that time that he would "talk" to the inmates. (App. at 35).

Thompson never filed an I–60 (an offender request form) or put in writing the names of any inmates that had threatened him between November 1, 2000, and December 7, 2000. (App. at 30–31).

Thompson was not assaulted on December 8, 9, or 10, 2000. (App. at 26).

On Monday, December 11, 2000, Thompson went to work in the garment factory. (App. at 27). His work station was directly in front of Officer Pruett's desk, and around 6:00 a.m. that morning he told Pruett that some guys were "trying to get him" and asked to be changed to the second shift. (App. at 28–29). Although Thompson is not certain, he believes that he told Pruett that inmate Burgess had threatened him. (App. at 31). Thompson was concerned for his safety in the garment factory because inmates Burgess, Lucky and Dice worked in the garment factory. (App. at 28). Thompson was not assaulted on December 11, 2000, but he was threatened by inmates in the garment factory. (App. at 30).

At about 10 a.m. on the morning of December 11, 2000, Thompson was let out of the garment factory by Security Officer Lipiecki to go to medical for his medication. (App. at 34). At this time, Thompson advised Officer Lipiecki that he had been assaulted on the weekend and that some guys were "out to get him." (App. at 34). He did not give Officer Lipiecki the names of any of the alleged offenders, but Thompson did tell him that Sergeant Kocher had said that he was going to talk to the offenders. (App. at 35). Officer Lipiecki advised Thompson that he would tell the major. (App. at 35).

Officer Lipiecki also advised Thompson that he could talk to rank on his way to the medical lay-in, he could talk to his building sergeant, or he could file an I–60 complaint. (App. at 109). Thompson complained to Lipiecki again on December 12, 2000, and Lipiecki advised him that he would "take care of it." (App. at 49).

Thompson asked Pruett for help again on December 12, 2000, when he went to work in the garment factory. (App. at 43, 110). Thompson asked Pruett if he had seen all the inmates coming by his work station to threaten him, but Pruett advised Thompson that he had not noticed it. (App. at 45–46). Pruett then asked Thompson if he would like to see the supervisor, Ms. Harris, but Thompson said that he did not want everyone in the garment factory to see him going into her office. (App. at 46, 108, 110). Pruett informed Ms. Harris sometime on December 12, 2000, that Thompson feared for his safety, and Ms. Harris contacted Lt. Garcia about Thompson's concerns. (App. at 108).

On December 13, 2000, Thompson complained about the threats to Officer Sherly.[5] (App. at 50–51).

On December 13, 2000, Officer Lipiecki told Lt. Jacobs that Thompson was having trouble with inmates on his dorm and in the garment factory. (App. at 109, 112). Lt. Jacobs began investigating the complaint on December 13, 2000, but did not complete the investigation because he discovered that it had been investigated the

day before by Sgt. Kocher. (App. at 109, 112).

Thompson was not assaulted on December 12 or 13, 2000. (App. at 43, 51–52).

On December 14, 2000, Thompson reported to work in the garment factory and seven different inmates came by his work station to threaten him. (App. at 52). There was an early rack-up that morning, and when Thompson was waiting in line to leave the factory, inmate Burgess came up to him and said, "We're going to get you today .... I know what you told Pruett." (App.54). Thompson then returned to his dorm and nothing else happened until he was walking back to the dorm after lunch. As Thompson came around a turnout outside the lunchroom, he saw three white gang members waiting for him. Although he continued to walk away, they began chasing him and he had to run all the way back to 19 Building. (App. at 55–56). The gang members did not catch Thompson and he reported the incident to Sgt. Leuck. (App. at 56). Sgt. Leuck and Ms. King arranged for Thompson to be moved to 11 Building, which houses inmates assigned to transit, prehearing detention, and solitary confinement but not inmates assigned to administrative segregation. (App. at 56–57, 63). Although Thompson was not assaulted on December 14, 2000, (App. at 52), he never returned to work in the garment factory after December 14, 2000. (App. at 57, 63, 88–89).

On December 14, 2000, at 3:00 p.m., Sgt. B. Nalepa began an investigation into

---

**5.** This is contradicted by the statement filed by Defendant Sherly on January 2, 2001, as part of the investigation into Thompson's complaints. Defendant Sherly stated that he gave Thompson a disciplinary case for refusing to do his work on December 14, 2000, but that he "was not aware that [Thompson] was having problems on the building" and Thompson had "never said a word to me that he was having problems on the building or

that anyone was after him or threatening him." (App. at 113). Because Thompson is the nonmoving party, the Court has considered his statement that Sherly was notified to be true. *See Goodson v. City of Corpus Christi*, 202 F.3d at 735 (holding that a court must consider the evidence and all reasonable inferences "in the light most favorable to the nonmovant").

Thompson's claims of life endangerment. (App. at 90–91). Sgt. Nalepa interviewed Thompson, Officer Lipiecki, and Ms. Harrison. (App. at 91). Although Sgt. Nalepa concluded that Thompson's claim could not be substantiated, he referred the investigation to the Unit Classification Committee. (App. at 91–92).

Thompson's request for a transfer to another unit was presented to the three-member UCC on December 20, 2000. (App. at 64, 87). The UCC denied his request for a transfer "due to lack of evidence," but ordered that Thompson be separated from inmate Burgess. (App. at 87, 92). The UCC then changed Thompson's housing assignment from 11 Building to 3C32 and assigned him to work in the laundry. (App. at 89). Major Oliver was chairman of the UCC panel that reviewed Thompson's classification on December 20, 2000. (App. at 64, 92).

When notified of the classification changes on December 20, 2000, Thompson advised Sgt. Cook that some of the gang members that had threatened him lived on that building and that he was not going to move there. (App. at 71). Sgt. Cook then instructed CO III Lusk to write Thompson a disciplinary case (no. 20010110458) for refusing the cell assignment. (App. at 71).

In disciplinary case no. 20010110458, Thompson was charged with failing to obey an order.[6] Following a hearing on December 21, 2000, Thompson was found guilty of the offense, and Captain Bardin, the hearing officer, assessed his punishment at a 30–day loss of commissary and recreation privileges, a reduction in his line-class status, and fifteen days in solitary confinement.

Thompson signed a step–1 grievance (# 2001074856) on December 22, 2000, and filed it with the Robertson Unit officials. (App. at 75). He complained that Sgt. Kocher had failed to take any action after having been told about the assault on December 7, 2000, and that Pruett, Sherly, Harrison, and Lipiecki had violated TDCJ–ID rules and state law because they had ignored his complaints about extortion and threats on his life. (App. at 75). Thompson stated that he wanted to be transferred to another unit or at least kept out of general population because he feared for his life. (App. at 75). This step–1 grievance was denied on February 7, 2001. (App. at 76).

Correctional Officer M. Sanchez conducted an interview with Thompson on December 27, 2000, after the Security Threat Group Office received an I–60 from Thompson complaining that he had been assaulted, was being threatened, and inmate Burgess was attempting to extort money from him. (App. at 41, 116). Thompson had sent the I–60 to Officer Gloyd and he had referred it to the Security Threat Group Office. (App. at 41). Officer Sanchez conducted a cell search on inmate Burgess's cell on January 4, 2001, in response to the interview with Thompson. (App. at 116). After further investigation, Officer Sanchez concluded that the Security Threat Group Office "could not verify any of the allegations that were made by Thompson about being assaulted because he was not seen by Medical at any

6. Although Defendants state that Thompson's disciplinary records are included in the Appendix to their Motion for Summary Judgment and there is a business records affidavit from the custodian of the TDCJ–ID disciplinary records (App. at 118), the Court notes that no disciplinary records were included after the affidavit. There were, however, properly authenticated copies of Thompson's disciplinary records in the TDCJ–ID records filed pursuant to the Magistrate Judge's order setting the *Spears* evidentiary hearing. To the extent that the disciplinary records do not contradict any of Thompson's allegations, the Court has considered them in ruling on the motion for summary judgment.

time of the incidents." (App. at 117). He did verify that on February 1, 2000, Sgt. Trumbo had conducted an investigation of a claim of life endangerment by Thompson. (App. at 117).

On or about January 2, 2001, Thompson filed an I–60 complaining about life endangerment and extortion, and the I–60 was referred to Correctional Officer R. Breeden. (App.77, 114–115). Officer Breeden interviewed Thompson and checked with the Security Threat Group Office regarding the status in that office of several inmates named by Thompson in his interview. (App.114). Breeden concluded that "[d]ue to the lack of physical evidence it is the recommendation of this investigator that both offenders [Thompson and Burgess] continued [*sic*] to be monitored until some type of physical evidence can be found to substantiate offender Thompson[']s claims." (App. at 115).

On January 4, 2001, Thompson signed a step–1 grievance (# 2001081841) and filed it at the Robertson Unit. (App. at 71). He complained about being assigned to solitary confinement and requested that he be transferred to another unit, disciplinary case no. 20010110458 expunged from his record, and his line-class status restored. (App. at 71). He also requested that the administration conduct further investigation into his complaints about life endangerment. The grievance was denied on February 15, 2001. (App. at 72).

On January 10, 2001, Sgt. Walters conducted an investigation into complaints of life endangerment by Thompson. (App.94–98). He noted that an incident had allegedly occurred on December 14, 2000, and that the administration had received an I–60 from Thompson on January 20, 2001. (App. at 95). Sgt. Walters reviewed copies of statements from Ms. Harrison, Officer Lipiecki, Officer Pruett, and Officer Sherly that had been obtained in an earlier investigation. (App. at 95). He

also interviewed Thompson at length about the claims. (App. at 96–97). Sgt. Walters concluded that

[t]wo previous investigations have been completed on these same allegations. One by Officer Breeden (extortion) and one by the Security Threat Group Office. As in the previous investigations, once again Offender Thompson ... could not provide sufficient evidence to support these allegations. Until a time comes when he can provide solid evidence, I recommend no further action be taken by the UCC.

(App. at 98).

The Robertson UCC was scheduled to review Thompson's housing and work assignments on January 11, 2001, but postponed making a decision on his case so that further investigation into Thompson's claims of life endangerment could be conducted. (App. at 87, 98). Warden Cook was the chairman of the three-person UCC on January 11, 2001. (App. at 98).

On January 17, 2001, Thompson appeared before the Robertson UCC and requested a transfer to another unit because his life was in danger. (App. at 87). The Committee denied Thompson's request "due to a lack of credible evidence." (App. at 87). He was then ordered to move from 11 Building to 7G21. (App. at 89). Major Oliver was a member of the Committee on January 17, 2001. (App. at 83, 87).

Thompson refused to move to 7 Building on January 17, 2001, and was charged with disciplinary case no. 20010134378 for refusing to obey an order. (App. at 83). After a hearing on January 19, 2001, Thompson was found guilty of the charge and Captain Avants, the disciplinary hearing officer, assessed his punishment at a 30–day loss of commissary and recreation privileges, a 60–day loss of good time credits, a reduction in his line class status, and 15 days in

solitary confinement. Thompson refused to move to 7 Building because he believed that inmate Burgess and at least three other gang members that had threatened him—Dice, Wallace, and Lucky—were housed on 7. (App. at 83).

Thompson signed a step–1 grievance (# 2001091592) on January 22, 2001, and filed it with Robertson Unit officials. (App. at 83). He complained that even though Major Oliver had ordered that he be kept separated from inmate Burgess, the UCC had ordered him to move to 7 Building where Burgess was housed. (App. at 83). He complained about disciplinary case no. 20010134378 and stated that he was "being punished for being afraid for [his] life." (App. at 83). This step–1 grievance was denied on March 2, 2001. (App. at 84).

Thompson finally accepted housing in general population on January 27, 2001, and on January 29, 2001, he was moved to 7H13. (App. at 89).

On January 30 or 31, 2001, Correctional Officer Hinkle was escorting Thompson to the medical department when he witnessed inmate Bauch threaten to assault Thompson. (App. at 59–60, 106). Officer Hinkle prevented a physical altercation but Thompson advised him that Bauch and some other inmates had tried to assault him on December 14, 2000, and that he had been threatened because inmates believed that he was a "snitch." (App. at 106). On February 1, 2001, Sgt. J. Cook began an investigation into this incident. (App. at 104–107). After Sgt. Cook completed the investigation, he recommended that Thompson be brought before the Unit Classification Committee. (App. at 105). Thompson was also moved back to 11 Building on February 1, 2001, and he remained there until he was transferred off the Robertson Unit on May 9, 2001. (App. at 89).

Thompson appeared before the UCC on February 6, 2001, and requested a transfer to another unit. (App. at 86, 103). The Committee, chaired by Asst. Warden R. Eason, recommended that Thompson be transferred to another unit and housed in a single cell in transient status pending review of the recommendation by the State Classification Committee. (App. at 86, 103).

On February 8, 2001, Thompson signed a step–2 grievance (# 2001074856) and filed it with prison officials. (App. at 73). He complained that Major Oliver had ignored his reports of life endangerment and had tried to force him to move to 3 Building even though it would place his life in danger. (App. at 73). Thompson complained that he had wrongfully been given disciplinary case no. 20010110458 and he wanted it reversed. (App. at 74). The grievance was denied on March 27, 2001, and Thompson was advised that he would remain in transient housing pending a final decision by the State Classification Committee. (App. at 74).

On February 22, 2001, Thompson signed another step–2 grievance (# 2001081841) and filed it with Robertson officials. (App. at 69). He complained that the UCC had tried to make him move to 3 Building on December 20, 2000, even though there were gang members who had threatened him living in that building. (App. at 69). This step–2 grievance was denied and Thompson was advised that there was sufficient evidence to support his finding of guilt in disciplinary proceeding no. 20010110458. (App. at 70).

Thompson signed a step–1 grievance (# 2001129352) on March 18, 2001, and filed it with prison officials. (App. at 81). He complained that even though he had sent Warden Eason an I–60 on March 8, 2001, the response had referred to a case for fighting and Thompson did not have a

case for fighting. (App. at 81). He requested that disciplinary case no. 20010134378 be expunged from his record and his good time and line class restored. (App. at 81). Thompson was advised on April 27, 2001, that his good time had been reinstated and that he had been reinstated to line-class S–4. (App. at 82).

On May 4, 2001, Thompson signed a step–2 grievance (# 2001129352) and filed it with Robertson officials. (App. at 79). He complained that Major Oliver deliberately ignored his complaints about life endangerment and ordered him transferred to 3 Building despite the separation order that he had previously filed. (App. at 79). Thompson further alleged that Major Oliver had acted in retaliation on both December 20, 2000, and January 17, 2001, when he ordered that Thompson be placed back in general population. (App. at 79). On May 21, 2001, Thompson was advised that he had "presented additional issues in [his] Step 2, which [would] not be addressed. All matters must first be investigated and responded to at the unit level before you submit an appeal." (App. at 80).

At all times relevant to the instant litigation, Defendants Eason, Cook, Gloyd, Trumbo, Oliver, Lipiecki, Pruett, Sherly, and Kocher were employed by the Texas Department of Criminal Justice, Institutional Division, an agency of the State of Texas.

## DISCUSSION

"[Section] 1983 is not itself a source of substantive rights; it merely provides a method for vindicating federal rights conferred elsewhere." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 n. 3 (5th Cir.1999). To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that an individual acting "under color of law" caused the deprivation of a right secured by the United States Constitution.

42 U.S.C. § 1983; *Scott v. Moore*, 85 F.3d 230, 232 (5th Cir.1996).

### I. Official Capacity

 Unless expressly waived, the Eleventh Amendment bars an action for damages under 42 U.S.C. § 1983 by a citizen of a state against his own state, including a state agency. *Aguilar v. Texas Dep't of Criminal Justice*, 160 F.3d at 1054. *See Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir.1998) ("As an instrumentality of the state, the TDCJ–ID is immune from a suit for money damages under the Eleventh · Amendment."). "The Eleventh Amendment also bars a suit against a state official when 'the state is a real, substantial party in interest.'" *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–102, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (citations omitted)). Thus, "[s]tate officers sued for damages in their official capacity are not 'persons' for purposes of the [§ 1983] suit because they assume the identity of the government that employs them." *Hafer v. Melo*, 502 U.S. 21, 27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). State officers sued for prospective injunctive relief in their official capacities, however, have been determined to be "persons" for purposes of a § 1983 suit and they are not entitled to immunity under the Eleventh Amendment. *Id. See Aguilar v. Texas Dep't of Criminal Justice*, 160 F.3d at 1054 (finding that a defendant official of the TDCJ–ID sued in his official capacity for prospective injunctive relief would not be entitled to Eleventh Amendment immunity).

The Court, therefore, finds that Thompson's claims for monetary damages against Defendants Eason, Cook, Gloyd, Trumbo, Oliver, Lipiecki, Pruett, Sherly, and Kocher in their official capacities should be dismissed under the Eleventh Amendment, but his claims for prospective equitable relief against the Defendants in their offi-

cial capacities should not be dismissed under the Eleventh Amendment.

■ Nevertheless, a plaintiff-prisoner's claims for injunctive and declaratory relief following an alleged violation of the Eighth Amendment may be mooted by his transfer to another prison facility. *Oliver v. Scott,* 276 F.3d 736, 741 (5th Cir.2002). *See Cooper v. Sheriff, Lubbock County, Tex.,* 929 F.2d 1078, 1084 (5th Cir.1991) (finding complaint about jail conditions which requested equitable relief was moot where inmate had been transferred to another prison). Thompson concedes that he was transferred from the Robertson Unit to another TDCJ unit in May of 2001. A plaintiff-prisoner may avoid dismissal of his equitable claims for mootness if he shows "either a 'demonstrated probability' or a 'reasonable expectation'" that he will be transferred back to the unit where the alleged violations occurred, or that he will be released and then reincarcerated in the unit where the alleged violations occurred. *Oliver v. Scott,* 276 at 741. Thompson, however, makes no such claims. *See Herman v. Holiday,* 238 F.3d 660, 665 (5th Cir.2001) (finding that an inmate's transfer from a detention center to a state correctional institute mooted his Eighth Amendment claims for declaratory and injunctive relief because any suggestion of a transfer back to the detention center was too speculative to warrant relief).

Accordingly, the Court finds that Thompson's claims for prospective equitable relief against Defendants Eason, Cook, Gloyd, Trumbo, Oliver, Lipiecki, Pruett, Sherly, and Kocher in their official capacities should be dismissed as moot.

## II. Exhaustion of Claims

■ "Title 42 U.S.C.A. § 1997e requires that a state prisoner exhaust available administrative remedies prior to filing suit in federal district court under 42 U.S.C.A. § 1983." *Wendell v. Asher,* 162 F.3d 887,

890 (5th Cir.1998). Section 1997e provides that

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C.A. § 1997e (Supp.2000). The "provision plainly requires that administrative remedies be exhausted before the filing of a § 1983 suit, rather than while the action is pending." *Wendell v. Asher, supra.* The Supreme Court has determined that § 1997e mandates exhaustion of administrative remedies "irrespective of the forms of relief sought and offered through [the] administrative avenues." *Booth v. Churner,* 532 U.S. 731, 741 n. 6, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). This exhaustion requirement, however, "is not jurisdictional and may be subject to certain defenses such as waiver, estoppel or equitable tolling." *Wright v. Hollingsworth,* 260 F.3d 357, 358 n. 2 (5th Cir.2001) (citing *Underwood v. Wilson,* 151 F.3d 292, 294–95 (5th Cir.1998)).

"The Texas Department of Criminal Justice currently provides for a two-step procedure for presenting administrative grievances." *Powe v. Ennis,* 177 F.3d 393, 394 (5th Cir.1999). "Step 1 requires the prisoner to submit an administrative grievance at the institutional level." *Wendell v. Asher,* 162 F.3d 887, 891 (5th Cir.1998) (citing Texas Dep't of Criminal Justice, Administrative Directive No. AD–03.82 (rev.1), Policy ¶ IV (Jan. 31, 1997)). "After an investigation, the unit grievance investigator makes a recommendation to the final decisionmaker for step 1 of the process, which may be the warden, assistant warden, facility administrator, assistant facility administrator, or health administrator." *Id.* "Step 2 permits the prisoner to submit

an appeal to the division grievance investigator with Institutional Division of the [TDCJ]." *Id.* This procedure takes about 90 days. *Id.* When a prisoner in TDCJ fails to complete both steps of the administrative grievance procedure prior to filing suit, without a valid excuse, defendants are entitled to judgment as a matter of law dismissing the complaint, but the dismissal must be without prejudice to refiling after completing both steps of the procedure. *Id.* at 891–92. *See Powe v. Ennis,* 177 F.3d at 394 (holding that the administrative remedies are deemed exhausted when a prisoner has filed his step 2 and the time has expired for the prison system to provide its response).

Defendants argue that Thompson failed to exhaust the TDCJ–ID administrative grievance procedures with respect to his claims against Defendants Trumbo, Gloyd, Eason, Cook, and Kocher. The Court has thoroughly examined the records provided by Defendants in the Appendix to their Motion for Summary Judgment and finds that Thompson failed to specifically complain about the action and/or inaction of Defendants Trumbo, Gloyd, or Cook in either step 1 or step 2 grievances. Although Thompson alleged that he had exhausted the administrative procedures in his complaint, he has failed to provide the Court with copies of the grievances that he allegedly filed and he has failed to object or present a defense to Defendants' request for summary judgment on the unexhausted claims. Accordingly, the Court finds that Thompson's claims against Defendants Trumbo, Gloyd, and Cook should be dismissed for failure to exhaust. In the alternative, the Court finds that for the reasons set forth below, the claims against Defendants Trumbo, Gloyd, and Cook should be dismissed with prejudice because they are entitled to the defense of qualified immunity.

Defendants also contend that Thompson has failed to exhaust his claims against Defendants Eason and Kocher. The Court, however, finds that Thompson did raise a complaint about Defendant Kocher in both steps of grievance no. 2001074856 (App. at 73, 75), and a complaint about Defendant Eason in at least step 1 of grievance no. 2001129352 (App. at 81). Because Thompson was proceeding *pro se* and may have assumed that he was sufficiently raising his complaints about Defendants Eason and Kocher, the Court finds that Defendants' request for summary judgment for want of exhaustion should be denied.[7]

The Court finds that Thompson has clearly exhausted his claims against Defendants Oliver, Lipiecki, Pruett, and Sherly.

### III. Qualified Immunity

"The doctrine of qualified immunity serves to shield … government official[s] from civil liability for damages based upon the performance of discretionary functions if the official[s'] acts were objectively reasonable in light of then clearly established law." *Thompson v. Upshur County, TX,* 245 F.3d 447, 456 (5th Cir.2001) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "The bifurcated test for qualified immunity asks whether the plaintiff has alleged a violation of a clearly established right and, if so, whether the defendant[s'] conduct was objectively unreasonable." *Palmer v. Johnson,* 193 F.3d 346, 351 (5th Cir.1999).

---

**7.** The Court notes that Thompson specifically raised allegations of retaliation only in his grievances against Defendant Oliver (App. at 73, 79 and 83) and he did not even imply retaliation by any of the other Defendants in any of the grievances. Thus, Thompson also did not exhaust his claims of retaliation by the other Defendants. Nevertheless, the Court shall address the merits of the retaliation claims because, for the reasons set forth below, Thompson has failed to defeat the Defendants' claim to qualified immunity.

Thus, when a defendant has filed a motion for summary judgment raising the defense of qualified immunity, a court must first determine whether the facts, "[t]aken in the light most favorable to the party asserting the injury," establish that the defendant officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

A prisoner-plaintiff bears the burden of defeating a defendant prison official's claim to qualified immunity. *Al–Ra'id v. Ingle*, 69 F.3d at 33.

"If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. at 201, 121 S.Ct. 2151. If the plaintiff has established the violation of a constitutional right, however, a court must then determine whether the right was "clearly established at the time of incident; and, if so, whether the conduct of the defendant was objectively unreasonable in light of that then clearly established law." ' *Palmer v. Johnson*, 193 F.3d 346, 351 (5th Cir.1999). This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." *Saucier v. Katz*, 533 U.S. at 201, 121 S.Ct. 2151. *See Pierce v. Smith*, 117 F.3d 866, 872 (5th Cir.1997) (holding that the first inquiry "will generally involve analysis at a higher level of generality than the second, which focuses not only on the state of the law at the time of the complained of conduct, but also on the particulars of the challenged conduct and/or of the factual setting in which it took place").

" 'Clearly established' means that 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates' " the plaintiff's constitutional rights. *Thompson v. Upshur*, 245 F.3d at 457

(quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier v. Katz*, 533 U.S. at 202, 121 S.Ct. 2151.

A defendant official's "acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." *Thompson v. Upshur*, 245 F.3d at 457 (emphasis in original). "The 'defendant's circumstances' includes facts know[n] to the defendant," but "because qualified immunity turns *only* upon the *objective* reasonableness of the defendant's acts, a particular defendant's subjective state of mind has no bearing on whether that defendant is entitled to qualified immunity." *Id.* (emphasis in original).

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

## A. Has Thompson established the violation of a constitutional right?

### 1. Failure to Protect

The Eighth Amendment imposes a duty on prison officials to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). *See Horton v. Cockrell*, 70 F.3d 397, 400 (5th Cir.1995) ("Prison officials have a duty under the Eighth Amendment to protect

inmates from violence at the hands of other prisoners."). *See also Hewitt v. Helms,* 459 U.S. 460; 473, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) ("The safety of the institution's guards and inmates is perhaps the most fundamental responsibility of the prison administration."). Not "every injury suffered by one prisoner at the hands of another," however, "translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer v. Brennan,* 511 U.S. at 834, 114 S.Ct. 1970. Rather, a prisoner-plaintiff must demonstrate both that (1) "he is incarcerated under conditions posing a substantial risk of serious harm" and (2) the defendant prison official's state of mind is one of "deliberate indifference" to the prisoner's safety.[8] *Id.; Horton v. Cockrell,* 70 F.3d at 401.

Although there is no concise definition of what prison conditions pose a "substantial risk of serious harm," the United States Court of Appeals for the Fifth Circuit has stated that a court

> must consider whether society considers the risk ... to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. [The court] must consider that the Eighth Amendment is intended to protect against both present and future dangers to inmates. Prison authorities must protect not only against current threats, but also must guard against sufficiently imminent dangers that are likely to cause harm in the next week or month or year.

*Horton v. Cockrell,* 70 F.3d at 401 (internal citations and quotations omitted).

 The Supreme Court of the United States has determined that the test for "deliberate indifference" is a subjective test:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate ... safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan,* 511 U.S. at 837, 114 S.Ct. 1970. The legal conclusion of deliberate indifference must rest on facts clearly evincing "obduracy and wantonness, not inadvertence or error in good faith." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). *See*

---

8. Defendants argue that Thompson must demonstrate that (1) prison officials were aware of a substantial risk of serious harm and (2) Thompson suffered serious physical harm after Defendants were made aware of the risk. This is patently incorrect because the Supreme Court has determined that a prisoner does not have to demonstrate that he has actually been assaulted before he seeks a remedy for unsafe conditions. *Farmer v. Brennan,* 511 U.S. at 845, 114 S.Ct. 1970.

Defendants also argue that 42 U.S.C. § 1997e(e) requires that a plaintiff show that he has suffered a physical injury before he is entitled to monetary damages for mental and emotional distress. The Fifth Circuit has determined that § 1997e(e) bars recovery for mental or emotional damages when a prison-

er claims cruel and unusual punishment under the Eighth Amendment. *Oliver v. Scott,* 276 F.3d 736, 747 n. 20 (5th Cir.2002). *See Herman v. Holiday,* 238 F.3d 660, 666 (5th Cir.2001) (holding that a plaintiff was not entitled to monetary damages on claims of "cold showers, cold food, unsanitary dishes, insect problems, lack of adequate clothing, and presence of open cesspool near the housing unit" because he failed to allege any physical injury resulting therefrom). The Fifth Circuit, however, has "not considered the application of [§ 1997e(e) ] to constitutional violations usually unaccompanied by physical injury ...." *Oliver v. Scott,* 276 F.3d at 747 n. 20. This Court need not address this issue, however, to address Defendants' claims to qualified immunity.

*Johnson v. Treen,* 759 F.2d 1236, 1237 (5th Cir.1985) (holding that the legal conclusion of deliberate indifference must rest on facts clearly evincing wanton behavior). The Supreme Court has explained that

> [w]anton means reckless—without regard to the rights of others .... Wantonly means causelessly, without restraint, and in reckless disregard of the rights of others. Wantonness is defined as a licentious act of one man towards the person of another, without regard to his rights; it has also been defined as the conscious failure by one charged with a duty to exercise due care and diligence to prevent an injury after the discovery of the peril, or under circumstances where he is charged with a knowledge of such peril, and being conscious of the inevitable or probable results of such failure.

*Smith v. Wade,* 461 U.S. 30, 39–40 n. 8, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (quoting 30 American and English Encyclopedia of Law 2—4 (2d ed.1905) (footnotes omitted)).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan,* 511 U.S. at 842, 114 S.Ct. 1970. "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id.* at 843, 114 S.Ct. 1970. "[T]he 'failure to alleviate a significant risk that [the official] should have perceived, but did not' is insufficient to show deliberate indifference." *Domino v. Texas Dep't of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Farmer v. Brennan,* 511 U.S. at 838, 114 S.Ct. 1970).

When a defendant raises the issue of qualified immunity in a motion for summary judgment, a court must carefully distinguish between the "deliberate indifference" standard necessary to establish § 1983 liability and the "objective reasonableness" standard which entitles a defendant to qualified immunity. *Thompson v. Upshur County, TX,* 245 F.3d at 459.

■ "Prison officials charged with deliberate indifference might show ... that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit soundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer v. Brennan,* 511 U.S. at 844, 114 S.Ct. 1970. Assuming without deciding, however, that Thompson has demonstrated that the Defendants were aware of his risk, the Court finds that he has failed to present, or point to any evidence in the record, to support his conclusory allegations that the Defendants were "deliberately indifferent" to the risk of harm. *See Horton v. Cockrell,* 70 F.3d at 401 ("Our society does not tolerate extortion inside or outside of prison, and also does not tolerate physical assaults ...."). *See also Eason v. Thaler,* 73 F.3d at 1325 ("[M]ere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment.").

Thompson has been given the opportunity to raise an issue of fact concerning the "deliberate indifference" of the Defendants, but when he failed to respond to the Motion for Summary Judgment, he failed to present any evidence which would allow a reasonable juror to find deliberate indifference. *Byers v. Dallas Morning News, Inc.,* 209 F.3d 419, 424 (5th Cir.2000). *See Stults v. Conoco, Inc.,* 76 F.3d at 657 (hold-

ing that when a nonmoving party fails to respond to a motion for summary judgment, he cannot meet his burden to "designate specific facts showing there is a genuine issue for trial").

The Defendants' summary judgment evidence demonstrates that each Defendant responded to Thompson's complaints about threats and assaults by reporting the complaints to supervising officers, conducting an investigation into the complaints, or referring the complaints to the proper prison authorities so that the complaints could be investigated. The evidence specifically shows that (1) Thompson's first complaint on February 1, 2000, was thoroughly investigated by Defendant Trumbo [9] and Thompson was transferred to another building and job; (2) Thompson did not file any complaints between February 1, 2000, and December 7, 2000; (3) no TDCJ–ID official witnessed the assault on December 7, 2000, and Thompson received no medical treatment; (4) Thompson's complaints were investigated by seven different TDCJ–ID officials between December 11, 2000, and February 1, 2001; (5) the first investigation that verified Thompson's complaints was completed on February 1, 2001; (6) Thompson appeared before the UCC on February 6, 2001, and the UCC recommended that he be transferred to another unit; (7) Thompson was housed in a single cell on 11 Building between December 14, 2001, and January 27, 2001, when he accepted a housing assignment on 7 Building; (8) after Thompson was threatened on January 30 or 31, 2001, he was immediately moved back to 11 Building where he remained until his transfer off the unit on May 9, 2001; and (9) Thompson incurred only minor scrapes and abrasions the one time that he was assaulted. There is no evidence that any

Defendant totally ignored Thompson's complaints or refused to verify the underlying facts. *Cf. Domino v. Texas Dep't of Criminal Justice*, 239 F.3d at 756 (holding that to show a deliberate indifference to medical needs, an inmate must show that the defendant official refused to treat the inmate, ignored the complaints, intentionally treated the inmate incorrectly, or "engaged in any similar conduct that would evince a wanton disregard for any serious medical needs").

Although Thompson disagrees with the way each Defendant handled his complaints and the record may even reflect that some Defendants may have been negligent in their handling of his complaints, "deliberate indifference cannot be inferred merely from negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur County, TX*, 245 F.3d at 459. *See Whitley v. Albers*, 475 U.S. at 319, 106 S.Ct. 1078 (holding that a violation of the Eighth Amendment must involve "more than an ordinary lack of due care for the prisoner's ... safety").

"Deliberate indifference is an extremely high standard to meet." *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d at 756. Thompson has failed to meet this standard. *See Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir.1995) (affirming a district court's dismissal of complaint that prison officials failed to protect plaintiff because allegations amounted only to a claim of negligence where prisoner showed that he had been assaulted by prison gang and threatened; plaintiff had been placed in solitary for about 6 months until transferred off unit; prison UCC denied request for transfer four times between assault and actual transfer because

---

**9.** Thompson stated at the *Spears* hearing that he was only complaining about the events that occurred after November 1, 2000, but he

named Defendant Trumbo in his complaint and the only allegations against Defendant Trumbo arose before November 1, 2000.

of insufficient evidence of life endangerment; plaintiff given multiple disciplinary cases for refusing housing; and plaintiff filed 33 grievances complaining about the threats and assaults).

For these reasons, the Court finds that Thompson has failed to establish that Defendants Eason, Cook, Gloyd, Trumbo, Oliver, Lipiecki, Pruett, Sherly, and Kocher acted with "deliberate indifference" to his safety and therefore have failed to demonstrate a constitutional claim under the Eighth Amendment for failure to protect. Even if a court should find that Thompson satisfied his burden of proving deliberate indifference, however, he has still failed to defeat Defendants' claim to qualified immunity for the reasons set forth in Part III.B., *infra.*

### 2. Retaliation

In his complaint, Thompson alleges that Defendants Gloyd, Trumbo, Oliver, Pruett, Sherly, and Kocher were deliberately indifferent to his safety in retaliation for Thompson's consenting to serve as a witness for inmate Carl Davis. At the *Spears* hearing, he also claimed that Defendant Lipiecki failed to report his life-endangerment claims in retaliation, and Thompson alleged that "the main people who retaliated were the administration who tried to house him where he would get hurt." Thus, it appears that Thompson is arguing that all named Defendants acted with deliberate indifference to his safety in retaliation for his agreeing to testify for another inmate in a civil proceeding.

Although Thompson argued at the *Spears* hearing that he had filed grievances complaining about the retaliation, the record contains only one grievance, no. 2001129352, which mentioned retaliation as a motive for any of the Defendants' acts. (App. at 79). Furthermore, this was a step–2 grievance that was not addressed on the merits because Thompson had presented issues in the step–2 which he had not presented in the step–1. (App. at 80). A review of Thompson's step–1 grievance no. 2001129352 shows that he did not raise retaliation but only complained about Defendant Eason's response to an I–60 about a disciplinary case. Accordingly, the Court finds that Thompson did not exhaust the TDCJ–ID administrative grievance process by filing both step–1 and step–2 grievances regarding the alleged retaliation by these Defendants.

Nevertheless, the Court has reviewed Thompson's retaliation claims and finds that, apart from his own speculative and conclusory allegations, he has provided no evidence to support the claims.

"To prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his ... exercise of that right, (3) a retaliatory adverse act, and (4) causation." *McDonald v. Steward,* 132 F.3d 225, 231 (5th Cir.1998). "Causation" requires the prisoner to show that "but for the retaliatory motive the complained of incident ... would not have occurred." *Johnson v. Rodriguez,* 110 F.3d 299, 310 (5th Cir. 1997).

"The [prisoner] must allege more than his personal belief that he is the victim of retaliation." *Jones v. Greninger,* 188 F.3d 322, 325 (5th Cir.1999). Thus, the prisoner "must produce direct evidence of motivation or, the more probable scenario, 'allege a chronology of events from which retaliation may plausibly be inferred.'" *Woods v. Smith,* 60 F.3d 1161, 1166 (5th Cir.1995) (quoting *Cain v. Lane,* 857 F.2d 1139, 1143 n. 6 (7th Cir.1988)). "This places a significant burden on the [prisoner]." *Woods v. Smith,* 60 F.3d at 1166.

Defendants have moved for summary judgment and Thompson has not responded to the motion or provided any documen-

tary or testimonial evidence to support his assertions of retaliation. *See Richardson v. McDonnell*, 841 F.2d 120, 122–123 (5th Cir.1988) (affirming a grant of summary judgment on a claim of retaliation because the prisoner "never offered any documentary or testimonial evidence to support his assertions" and thus there were no material issues of disputed fact). Moreover, although not required to do so, the Court has reviewed the pleadings and Defendants' summary judgment evidence but cannot find any evidence that any Defendant acted with a retaliatory motive or that a chronology of events exists which would even support a reasonable inference of retaliation. *See Whittington v. Lynaugh*, 842 F.2d 818, 819 (5th Cir.1988) ("It is a virtual truism that any prisoner who is the subject of an administrative decision that he does not like feels that he is being discriminated against for one reason or another, such as the past filing of a grievance, a complaint about food or a cellmate, or a prior complaint that he was not being treated equally with other prisoners.").

Accordingly, the Court finds that Thompson's conclusory allegations of retaliation are insufficient to establish a constitutional claim for retaliation and defeat Defendants' claims to qualified immunity and summary judgment. *See Woods v. Smith*, 60 F.3d at 1166 ("Mere conclusionary allegations of retaliation will not withstand a summary judgment challenge.").

**B. If Thompson established the violation of a constitutional right, has he established that the Defendants' actions were clearly unreasonable in light of the then clearly established law?**

▮ Defendants argue that even if the Court finds that Thompson established a claim for failure to protect under the Eighth Amendment, they are entitled to qualified immunity because their conduct

was "objectively reasonable in light of that then clearly established law." *Palmer v. Johnson*, 193 F.3d at 351. "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Goodson v. City of Corpus Christi*, 202 F.3d at 736. "The issue of whether and when a right is clearly established is typically treated as a matter of law." *Pierce v. Smith*, 117 F.3d at 871. "Likewise, to the extent that the relevant discrete, historic facts are undisputed, . . . the question of the objective reasonableness of a defendant's conduct—*i.e.*, whether at the time and under the circumstances all reasonable officials would have realized the particular challenged conduct violated the constitutional provision sued on—is also a question of law." *Id.*

"Examples of behavior that does (and does not) constitute deliberate indifference are relevant in assessing the scope of clearly established law and, therefore, are relevant in determining whether the defendant['s] actions were objectively reasonable." *Thompson v. Upshur County, TX*, 245 F.3d at 459. "However, when the defendant moves for summary judgment based on qualified immunity, it is the plaintiff's burden to demonstrate that all reasonable officials similarly situated would have then known that the alleged acts of the defendant violated the United States Constitution." *Id.* at 459–460 (internal citations omitted). *See Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (holding that immunity should be recognized if officers of reasonable competence could disagree). This is a significantly different burden than establishing "a genuine issue as to the defendant's deliberately indifferent subjective state of mind." *Id.* at 460.

Thompson failed to show that Defendants Eason or Cook[10] were deliberately indifferent to his life-endangerment claims, and he has failed to provide any evidence that their responses to his claims were objectively unreasonable. The only evidence to show that Defendant Cook was even made aware of Thompson's life-endangerment claims is the summary judgment evidence showing that he served as chairperson of the Robertson UCC that reviewed Thompson's life-endangerment claims on January 11, 2001. The Committee, however, postponed making a decision on that day so that the claims could be further investigated. Thompson was housed in a single cell in 11 Building at the time and he remained there until his next appearance before the UCC. The simple fact that Defendant Cook and the remaining members of the Committee requested that the claims be investigated does not show that Defendant Cook responded unreasonably; rather, it implies that the Committee wanted some evidence to validate his claims to insure that their classification decision would provide him the constitutionally safe environment to which he was entitled.

About a week later, on January 17, 2001; Thompson appeared before the UCC again, but the Committee denied his request for a transfer "due to a lack of credible evidence." Although it is not clear from the record whether Defendant Cook served on this January 17 Committee, it is clear that he was not the chairperson because Defendant Oliver was the UCC chairperson on January 17, 2001. Even if Defendant Cook served on the January 17 UCC, however, there is nothing to show that the Committee's finding that there was a lack of credible evidence was unreasonable.

The only evidence to show that Defendant Eason was made aware of the threats to Thompson's safety is the record showing that he served as chairperson of the Robertson UCC that reviewed Thompson's life-endangerment claims on February 6, 2001. The Committee reviewed the claims on February 6, 2001, and recommended that Thompson be transferred to another unit and housed in a single cell in transient status pending review of the recommendation by the State Classification Committee. Thompson does not even argue that this was an objectively unreasonable response to his life-endangerment claims and he has failed to show that Defendant Eason was ever made aware of the problems until he served on this UCC.

Thompson alleges that Defendant Gloyd acted unreasonably because he never came to see Thompson after he received the I-60. The undisputed evidence clearly shows that when Defendant Gloyd received Thompson's I-60 complaining about life endangerment, he referred it to the Robertson Security Threat Group Office. The complaint was then assigned to Correction-

---

**10.** To the extent that Thompson's vague complaints against Defendants Assistant Wardens Eason and Cook can be construed to raise claims that they failed to insure his safety by properly supervising other employees at the Robertson Unit, he must demonstrate that they breached "a duty imposed by state or local law, and this breach cause[d] [Thompson's] constitutional injury." *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir.1998). This requires that Thompson specifically show that "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Id.* at 911–912. Other than his conclusory allegation that Defendants Eason and Cook violated state law, Thompson neither alleges nor shows which law was violated, how these Defendants failed to train or supervise, a causal link between the failure and his alleged injury, and facts to establish deliberate indifference.

al Officer Sanchez, who conducted a lengthy interview of Thompson on December 27, 2000; searched the cell of inmate Burgess on January 4, 2001, in response to some of Thompson's allegations; noted that Defendant Trumbo had previously investigated a life-endangerment claim by Thompson on February 1, 2000; and concluded that Thompson's allegations could not be verified at that time. There is nothing in the record to show that Thompson ever contacted Defendant Gloyd again regarding his claims of life endangerment. Thus, Thompson presents absolutely no evidence to show that Defendant Gloyd's referral of the complaint to an investigating officer was objectively unreasonable.

As for Defendant Trumbo, the undisputed evidence clearly shows that Defendant Trumbo was made aware of Thompson's complaints only when he investigated Thompson's complaints about the altercation in the laundry in February of 2000. The evidence also shows that after Defendant Trumbo investigated the complaint and recommended that Thompson be assigned a new job and new housing, Thompson was reassigned to the garment factory and moved to another building—Thompson even signed a waiver agreeing that this would solve his problems. There is nothing in the record to show that Defendant Trumbo was ever made aware of any of Thompson's complaints after he completed his investigation in February of 2000. Clearly, Defendant Trumbo responded in a more than reasonable manner to the only complaint Thompson ever conveyed to him.

Thompson next complains that Defendant Oliver ignored his pleas for a transfer and protection because he denied his repeated requests for a transfer; he gave him disciplinary cases when Thompson refused housing that would place him in danger; and he assigned him housing that would place him in danger. The summary judgment evidence shows that Sgt. Nalepa conducted an investigation into Thompson's life-endangerment claims on December 14, 2000, by interviewing Thompson, Defendant Lipiecki, and Ms. Harrison, supervisor of the garment factory. Although he concluded that the claims could not be substantiated, he referred the complaint to the Robertson UCC. Thompson's request for a transfer was presented to the UCC on December 20, 2000. Defendant Oliver chaired the three-person UCC on December 20, 2000, which denied the request for a transfer "due to lack of evidence" but ordered that Thompson be separated from inmate Burgess. The Committee also changed his work assignment from the garment factory (where Burgess allegedly worked) to the laundry and his housing assignment from 11 Building to 3 Building.

When Thompson was told about the new housing assignment, he refused to move because he said that some gang members that were after him lived on 3 Building. There is nothing in the record to show that inmate Burgess lived on 3 Building. Although Thompson was given a disciplinary case for refusing the cell assignment, the record clearly shows that Defendant Oliver did not give him the disciplinary case or preside over the disciplinary hearing. Thompson remained housed in a single cell in 11 Building after the disciplinary hearing.

Defendant Oliver was also a member of the UCC which reviewed Thompson's life-endangerment claims January 17, 2001. The summary judgment evidence shows that, by this time, three officers, Correctional Officer Sanchez, Correctional Officer Breeden, and Sgt. Walters, had conducted additional investigations into Thompson's complaints. Each officer concluded that Thompson's claims could not be verified, but Officer Breeden also recommended that Thompson and inmate Burgess continue to be monitored. The UCC denied

Thompson's request for a transfer on January 17, 2001, "due to a lack of credible evidence" and ordered Thompson to move to 7 Building.

When Thompson was told about the UCC's decision, he refused to move to 7 Building and was given another disciplinary case for refusing a cell assignment. Although he argues that he refused the cell assignment because inmate Burgess and other gang members lived on 7 Building, there is nothing in the record to show that Defendant Oliver gave him the disciplinary case or presided over the disciplinary proceedings. Moreover, the record also clearly shows that this disciplinary case was expunged from his prison record and his good time and line-class status were restored. Furthermore, Thompson himself agreed to be housed in general population and was moved to 7 Building without protest on January 29, 2001. There is nothing in the record to support a claim that Defendant Oliver acted unreasonably in relying on the investigative reports from numerous officers nor has Thompson demonstrated that any reasonable official in Oliver's position would have known that he was violating Thompson's constitutional rights.

Thompson claims that Defendant Lipiecki failed to take any action after being told on December 11, 12, 13, and 14, 2000, that he had been assaulted on December 7, 2000, and that he continued to be threatened. The summary judgment evidence shows that Defendant Lipiecki was a security officer who escorted Thompson to the infirmary once a day during his work shift for his medications. The summary judgment evidence also shows that on December 13, 2000, Defendant Lipiecki told Lieutenant Jacobs that Thompson was having trouble with some inmates in the garment factory and on his dorm. Thompson concedes that he did not give the names of any gang members to Defen-

dant Lipiecki but that Lipiecki told him that he would give the information to a ranking officer and also advised him to file an I–60 complaint, talk to the building sergeant in his dorm, or talk to rank on his way to the medical lay-in. Based upon the very limited contact that Thompson had with Defendant Lipiecki, neither his advice to Thompson nor his merely relaying the information to a ranking officer was unreasonable.

As for Defendants Pruett and Sherly, Thompson has completely failed to present any evidence to show that officers in their positions would have known that their actions were unconstitutional.

Finally, Thompson complains that Defendant Kocher was aware that he was assaulted on December 7, 2000, and his failure to take any action to protect Thompson resulted in another attempted assault and multiple threats. The summary judgment evidence shows that Defendant Kocher was made aware of a complaint by Thompson, he told Thompson that he would talk to the inmates, and he conducted an investigation into the complaint. Defendant Kocher contends that his actions were reasonable and Thompson has failed to provide any evidence to the contrary.

For these reasons, the Court finds that Thompson simply failed to come forward with any evidence to demonstrate that the named Defendants' actions in response to his complaints about life endangerment were objectively unreasonable; therefore, the Defendants are entitled to qualified immunity on Thompson's claims that the officers failed to protect him from the assaults, threats, and extortion attempts by other inmates. *See Cantu v. Jones,* 293 F.3d 839, 845 (5th Cir.2002) (affirming the trial court's denial of qualified immunity after trial because the jury found that the defendants acted with deliberate indiffer-

 

ence and thus their behavior was objectively unreasonable).

## CONCLUSION

For the reasons stated above, the Court finds that Plaintiff Thompson has failed to demonstrate that Defendants Eason, Cook, Gloyd, Trumbo, Oliver, Lipiecki, Pruett, Sherly, and Kocher violated his constitutional rights by failing to protect him or by retaliating against him. The Defendants have demonstrated that they are entitled to the defense of qualified immunity and their Motion for Summary Judgment should be granted.

It is, therefore, ORDERED that

1. Thompson's claims for equitable relief regarding his religious claims are dismissed with prejudice pursuant to the Agreed Stipulation of Partial Dismissal filed on December 16, 2002, and Federal Rule of Civil Procedure 41(a)(1)(ii).

2. Thompson's claims for monetary damages against Defendants Eason, Cook, Gloyd, Trumbo, Oliver, Lipiecki, Pruett, Sherly, and Kocher in their official capacities are dismissed with prejudice pursuant to the Eleventh Amendment.

3. Thompson's claims for prospective equitable relief against Defendants Eason, Cook, Gloyd, Trumbo, Oliver, Lipiecki, Pruett, Sherly, and Kocher in their official capacities are dismissed as moot.

4. Defendants' Motion for Summary Judgment is granted.

5. Thompson's claims for monetary damages against Defendants Eason, Cook, Gloyd, Trumbo, Oliver, Lipiecki, Pruett, Sherly, and Kocher in their individual capacities are dismissed with prejudice.

Judgement shall be entered accordingly.

All relief not expressly granted is denied and all pending motions are hereby denied.